IN THE SUPERIOR COURT FOR THE DISTRICT OF ~~COLUMBIA~~

Civil Division

RECEIVED
Civil Clerk's Office

MAY 0 3 2013

Superior Court of the
District of Columbia
Washington, D.C.

RAYMONE K. BAIN            :
4770 Dexter St., NW        :
Washington, DC 20007       :
                           :
        Plaintiff          :
                           :
vs.                        :        CA No. __13 - 0003107__
                           :
GARY, WILLIAMS, PARENTI, WATSON &   :
GARY, P.L., *a Florida Professional Limited*   :
*Liability Company*        :
221 East Osceola Street    :
Stuart, FL  34994-2210     :
                           :
    Serve:  Thomas E. Weiksnar, Esq.   :
            221 East Osceola Street    :
            Stuart, FL  34994-2210     :
                           :
    and                    :
                           :
WILLIE E. GARY             :
36 Rio Vista Drive         :
Stuart, FL  34996-6422     :
                           :
    and                    :
                           :
LINNES FINNEY, JR.         :
10960 Pine Creek Lane      :
Port Saint Lucie, FL  34986-3106   :
                           :
        Defendants         :
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## **COMPLAINT**

Raymone K. Bain, by counsel Steven M. Pavsner and Joseph, Greenwald & Laake, P.A.,

sues the defendants for legal malpractice which caused her to lose, or to lose the full value of,

claims worth over Two Hundred Million Dollars ($200,000,000) against entertainer Michael

EXHIBIT A

Jackson (later the Estate of Michael Jackson), and his production company MJJ Productions, Inc, and as grounds states:

## Jurisdiction and Venue

1.   This Court has subject matter jurisdiction pursuant to DC Code §11-921 (as amended)s.

2.   Venue lies in the District of Columbia, this being the jurisdiction where the claim arose, where plaintiff resides, and where all defendants do business or did the business giving rise to the claim.

## Parties

3.   Plaintiff Raymone K. Bain is a natural person and citizen of the District of Columbia. Ms. Bain is CEO and Co-Founder of the public relations firm of Davis, Bain & Associates, Inc., and at all times pertinent was President and COO of the Michael Jackson Company, LLC. In addition to international pop icon Michael Jackson, Ms. Bain has represented many high profile public figures in the sports, entertainment and political fields.

4.   Defendant Gary, Williams, Parenti, Watson & Gary, P.L. ("Gary Firm") is a Florida professional limited liability company with its principal place of business at 221 East Osceola Street in Stuart, Florida.   At all times pertinent to the Complaint, the Gary Firm was known by its previous name, Gary Williams, Finney, Lewis, Watson & Sperando, P.L.

5.   At all times pertinent, the Gary Firm was engaged in the practice of law in the District of Columbia through its professional agents, servants and employees hereinafter identified.   The Gary Firm, and its individual attorneys identified herein, are hereafter referred to collectively as the "Gary Defendants."

2

6.  Defendant Willie E. Gary is a natural person and, on information and belief, a resident of Florida and a lawyer who, at all times pertinent, was an agent, servant or employee of the Gary Firm, acting within the scope of his employment.

7.  Defendant Linnes Finney, Jr. is a natural person and, on information and belief, a resident of Florida and a lawyer who, at all times pertinent, was an agent, servant or employee of the Gary Firm, acting within the scope of his employment.

### The Underlying Claim

8.  On or about December 2003, Mr. Jackson hired Davis, Bain & Associates, Inc., as his public relations firm and appointed Ms. Bain individually as his personal spokesperson and publicist.

9.  As his publicist, Ms. Bain performed public relations consultation services for Mr. Jackson including planning, coordination, and supervision of proactive media strategies; crisis management and damage control; preparation and distribution of press releases; and preparation of promotional materials, supervision and coordination of media appearances, interviews and press conferences, special projects and personal appearances. As his spokesperson, Ms. Bain became Mr. Jackson's official voice for all public matters, including his child molestation trial which began in January 2005, and lasted for approximately six months. Ms. Bain continued her duties as spokesperson and publicist after Mr. Jackson's acquittal.

10. On or about May 30, 2006, Mr. Jackson expanded Ms. Bain's role in his affairs, entering into a written agreement ("Personal Services Agreement"), directing Ms. Bain to incorporate a new company for Mr. Jackson, namely, The Michael Jackson Company, Inc., (hereinafter "TMJC", which later became The Michael Jackson Company, LLC), appointing Ms. Bain President/COO of TMJC, and outlining her respective responsibilities.  A true and correct

3

copy of the Personal Services Agreement is attached hereto and incorporated by reference herein as Exhibit 1.

11. Mr. Jackson signed a second document ("General Manager Agreement") appointing Ms. Bain as his personal General Manager. A true and correct copy of the General Manager Agreement is attached hereto and incorporated by reference herein as Exhibit 2.

12. According to the Personal Services Agreement, Ms. Bain was to receive a 10% fee of any agreements entered into by Mr. Jackson or TMJC that were generated by or due to the direct efforts of Ms. Bain and/or Ms. Bain's contacts.

13. Throughout the term of the Personal Services Agreement, and while acting as President and COO of TMJC, Ms. Bain performed her duties faithfully and diligently.

14. At the time of entering into her expanded role with Mr. Jackson, Ms. Bain was not aware of the extent, magnitude and severity of the legal, financial and other pressing issues faced by Mr. Jackson which, if not handled immediately and properly, would have caused Mr. Jackson substantial harm.

15. As directed by Mr. Jackson, Ms. Bain immediately contacted prospective managers who were capable of servicing an entertainer of Mr. Jackson's magnitude, and began scheduling meetings with said individuals, beginning in November, 2006, in Ireland. In addition, Ms. Bain scheduled meetings, also held in Ireland, between Mr. Jackson and recording artists, producers and songwriters.

16. Ms. Bain recruited, introduced to Mr. Jackson for his approval, and hired on Mr. Jackson's behalf, an accounting team and experienced legal counsel, including: former U.S. Attorney General Benjamin Civiletti, Esq. and Gregory Cross, Esq. of Venable LLP; L. Londell McMillan, first of the McMillan Firm, then of the law firm of Dewey & LeBeouf, LLP; and

Peter Lopez, Esq., of Kleinburg, Lopez, Lange, Cuddy and Edel, LLP, and Fred C. Cooke of Rubin, Winston, Diercks, Harris & Cooke, LLP.

17. Ms. Bain instructed the initiation of and supervised Mr. Jackson's accounting team in an audit of Mr. Jackson's personal and professional finances and receivables to fully inform Mr. Jackson of his financial condition.

18. Ms. Bain averted imminent foreclosure of several of Mr. Jackson's properties in 2006 and 2007 by arranging emergency refinancings. She also supervised the management and payment of Mr. Jackson's day to day, weekly and monthly bills, and supervised the transition of Mr. Jackson's and his children's relocations from France to Ireland, and encouraged and supervised his move from Ireland back to the United States, specifically to Las Vegas, Nevada on December 23, 2006.

19. Ms. Bain arranged housing, abroad and in the United States, and oversaw Mr. Jackson's day to day living requirements including, but not limited to: insurances, personal requirements and expenses, travel, security and personal staffs, and payments to employees at Neverland Valley Ranch (Mr. Jackson's former residence) and Hayvenhurst (the Jackson family residence).

20. Ms. Bain identified and hired a new personnel company to take over responsibilities of the previous payroll company, which had abruptly resigned, in order to continue to pay employees of Hayvenhurst, Neverland Valley Ranch, and other employees of Mr. Jackson.

21. On or about June 1, 2006, Mr. Jackson appointed Ms. Bain as his agent to review and approve music usage requests from Warner/Chappell Music, Inc., relating to the MIJAC and MIRAN publishing companies.  A true and correct copy of Ms. Bain's agency appointment is attached hereto as Exhibit 3. Pursuant to and immediately following this appointment, Ms Bain

approved hundreds of requests which generated over ten million dollars ($10,000,000) of annual income.

22. Ms. Bain directed and supervised a team of accountants who intervened on Mr. Jackson's behalf with the California Department of Labor to address complaints filed by Neverland Valley Ranch employees. During this period, Ms. Bain also supervised an accounting team that represented Mr. Jackson in numerous audits originated by the California Department of Labor.

23. Ms. Bain approved and supervised the payment of disbursements including those to security personnel, employees, consultants, creditors, vendors, attorneys, accountants, dancers, choreographers, travel agencies, personal physicians, and all others requiring payments.

24. Ms. Bain supervised Mr. Jackson's accountants in the preparation, filing and payment of Mr. Jackson's taxes, both personal and property.

25. Ms. Bain supervised and coordinated the activities of six law firms which represented Mr. Jackson, and managed the litigation of cases on Mr. Jackson's behalf, (including settlements), which, if not handled properly, could have caused Mr. Jackson to forfeit his share of the SONY/ATV music catalog (which includes the Beatles Catalog).

26. In 2006 Ms. Bain was appointed by Mr. Jackson as a trustee of MJ Publishing Trust, and as a member of the SONY/ATV Board of Directors, SONY Music Corporation, to represent Mr. Jackson's best interests. Ms. Bain as trustee was one of the guarantors of the $360 million SONY/ATV loan refinance in 2007. If the loan had not been refinanced, Mr. Jackson would likely have lost his $2.3 billion publishing asset, which includes the Beatles catalogue.

27. Upon Mr. Jackson's return to the United States in December 2006, Ms. Bain encouraged Mr. Jackson to sanction and participate in the commemoration of the 25th

anniversary of the release of Mr. Jackson's historic Thriller album. Upon Mr. Jackson's sanction, in early 2007, Ms. Bain contacted SONY Music to discuss the possibility of the company doing something special to commemorate the 25th anniversary of "Thriller" and to schedule an initial meeting to discuss the same. After this time, Ms. Bain worked closely with SONY Music and Legacy Records in the planning, and development of said commemoration, including the marketing and promotion of the project, and to structure a deal for the 25th anniversary CD, and related entertainment products (hereinafter the "Thriller deal"). Concurrently, Ms. Bain commenced a dialogue with respected award-winning producer, Ken Erlich, regarding Mr. Jackson's participation at the 2008 Grammy Awards, and related activities.

28.    Upon information and belief, Mr. Jackson was compensated for the Thriller deal on or about December 6, 2007, (unbeknownst to Ms. Bain or even Mr. Jackson himself until mid February 2008), and the 25th anniversary CD was released on or about January 12, 2008.

29. Upon information and belief, millions of copies of the commemorative Thriller CD have been sold.

30. In October 2006, Ms. Bain reached out to John Meglin of Anchutz Entertainment Group, Inc. ("AEG"). Beginning in January 2007, Ms. Bain initiated what became year long negotiations with AEG regarding a comprehensive entertainment deal for Mr. Jackson, which also included, at the time, re-development of the Neverland Valley Ranch, and recording and film projects. The entertainment deal also included several live performances by Mr. Jackson at the O2 Arena in London, England.

31. On several occasions, beginning on or about January 2007, Ms. Bain met with AEG representatives including Messrs. Randy Phillips, Tim Lewinski, Paul Gongaware, and John Meglin. Mr. Jackson was present at all but one of those meetings. In addition, Ms. Bain and Mr.

Jackson met with representatives from AEG's film division regarding Mr. Jackson's interest in producing films including film projects directed to Pharaoh Tutankhamun "King Tut", Thriller and CGI Animation, and met with Phil Quintero, whom AEG brought in to head up the recording aspects of the deal for Michael Jackson

32. Ms. Bain recruited, organized, served on, and convened a six-member Financial Advisory Board at Mr. Jackson's directions, and for Mr. Jackson and the MJC's benefit, comprised of legal, financial and business advisors to assist Mr. Jackson regarding refinancing the loan that Mr. Jackson had previously taken out against the SONY/ATV music catalog.

33. Due to the complex nature of the refinancing, and its many wide-ranging implications, the Financial Advisory Board conferred with Mr. Jackson regularly from about April 2007 to completion of the SONY/ATV loan refinancing. Ms. Bain actively participated as an integral member of the Financial Advisory Board. She scheduled and coordinated conference calls and meetings, with Mr. Jackson and others and guaranteed Mr. Jackson's participation therein.

34. The loan on the SONY/ATV music catalog was refinanced in three phases. All phases were completed in early 2008. The refinancing provided Mr. Jackson, personally, over twenty-five million dollars ($25,000,000) in cash. An additional sixteen million plus dollars ($16,000,000) was allocated to Mr. Jackson to pay off various debts, including his accounts payables (vendors, travel agents, attorneys, accountants, consultants and other creditors); and, monies to pay agreed upon legal settlements.

35. Following completion of the loan refinancing, Mr. Jackson compensated every member of the Financial Advisory Board except Ms. Bain and the only other female member, whom he promised to compensate later.

36.. Among the many creditors who were awaiting and had been promised payment from the proceeds of the loan refinancing, were Ms. Bain and others whose goods, services and funds she had obtained on Mr. Jackson's behalf and for his benefit.  Ms. Bain individually had not been paid her base monthly fee of $30,000 for the past nine months, and had incurred other expenses, including cash advances and loans, on Mr. Jackson's behalf and for his benefit.  All told, Ms. Bain and others were due $218,820.05, for an undisputed past due total of $488,820.05.

37. Before he would authorize funds from the refinancing proceeds to pay these overdue debts, Mr. McMillan demanded that Ms. Bain sign what he represented to be an accounting and release with respect to specific past due amounts.  Ms. Bain was not represented by counsel and was reluctant to sign the document, but was threatened by Mr. McMillen that no one would be paid the past due amounts they were owed unless she did so, and assured by Mr. McMillan that the document did nothing more than resolve the specifically itemized past due amounts that comprised the $488,820.05 to be paid.

38. Prior to signing the document, Ms. Bain called Mr. Jackson and asked him why she and others were being required to sign a release prior to receiving past due amounts she and others were owed.  Ms. Bain had previously received calls from Katherine Jackson on behalf of Hayvenhurst staff, and from Joe Marcus on behalf of Neverland staff, asking the same basic question—why they should have to sign a release for long overdue amounts indisputably due.  Ms. Jackson in particular referred to the demand for such releases as blackmail.  Mr. Jackson told Ms. Bain that he did not understand it himself, and that people who worked for him should not be blackmailed into signing releases as a condition for receiving undisputed past due amounts, but that Mr. McMillan was insisting on similar releases from many persons to whom Mr.

Jackson owed money and who had been awaiting payment— in some cases for more than a year; had been promised payment from the loan proceeds; and desperately needed to be paid. Mr. Jackson implored Ms. Bain to sign the document so that the people to whom he owed and promised these past due amounts would be paid, and represented to Ms. Bain that he had no intention of signing the agreement himself, so that she could sign it to satisfy Mr. McMillan without concern.

39. At Mr. McMillan's insistence and with the representations and assurances provided by him and by Mr. Jackson, on or about December 27, 2007 Ms. Bain signed a document entitled "Payment & Release Agreement" (hereafter, "alleged Release"). A copy of the alleged Release is attached hereto and incorporated by reference herein as Exhibit 4.

40. Over the ensuing months, Ms. Bain continued to serve Mr. Jackson's interests as she had before. Among other things, she continued to serve Michael Jackson's interests as music licensing agent for MIJAC and MIRAN publishing companies, as Trustee of MJ Publishing Trust, as a Director of Sony/ATV Music Publishing, as General Manager and Spokesperson for Michael Jackson, and as President/COO of MJC.

41. During the ensuing months, Ms. Bain did not receive a copy of the alleged Release signed by Michael Jackson, and therefore reasonably assumed that he had not signed it as he said he would not. Nevertheless, she began to hear rumors that her services had been terminated.

42. After signing the alleged Release, and upon hearing the rumors that she had somehow been terminated from her several positions, Ms. Bain called Mr. Jackson in order to clarify her situation. In response to her inquiries, Mr. Jackson faxed a letter to Ms. Bain dated April 24, 2008, as follows:

## MICHAEL JACKSON

April 24, 2008

Ms. Raymone K. Bain
4770 Dexter Street, N.W.
Washington, D.C. 20007

Dear Raymone:

I have never terminated your services nor did I null and void any of your Agreements.

I know nothing about a release form. I neither authorized or signed the same.

Therefore, I am authorizing you to continue to communicate with Mr. Yakoob regarding the Sultan's property in Las Vegas, and to continue your role as my General Manager and President/COO of The Michael Jackson Company.

Thank you.

Sincerely,



Michael J. Jackson

("April 24th Letter"). A copy of the April 24th Letter is attached hereto and incorporated by reference herein as Exhibit 5.

43. In the Underlying Case, the Jackson Defendants presented a copy of the alleged Release, purportedly signed by Mr. Jackson. Ms. Bain believes, and therefore avers, that Mr. Jackson's signature on the alleged Release is not genuine, that he did not sign it, and that it is therefore neither valid nor binding upon her. Ms. Bain's belief is supported by the facts set forth above, and by the expert opinion of a questioned document examiner.

44. After receiving the April 24th Letter by fax, Ms. Bain continued to serve Mr.

Jackson's interests as she had before. In addition to those itemized above and others, in November 2008 she assisted Mr. Jackson's counsel by drafting a response to a lawsuit filed against him by Prince Abdullah. In this and many other ways, large and small, Ms. Bain continued to promote Mr. Jackson's interests.

45. On March 5, 2009, Mr. Jackson held a press conference in London, England to announce that he had signed an agreement with AEG, whereby he would perform a series of concerts beginning July 8, 2009, at the O2 arena. Media reports at the time quoted Randy Phillips of AEG as stating that the AEG deal was worth as much as four-hundred million dollars ($400,000,000) in revenue to Mr. Jackson. It is now widely known that tickets have sold out for fifty (50) Jackson concert dates, and that a series of concerts was scheduled from July 2009 through February 2010.

46. In accordance with her Personal Services Agreement, Ms. Bain was due a fee of 10% of the monies earned by Michael Jackson, MJJ Productions or MJC from the AEG deal and others that were generated by or due to her direct efforts and/or of her contacts.

47. Ms. Bain attempted to resolve these contractual matters with the Jackson Defendants but was rebuffed, as it became increasingly difficult for Ms. Bain and other members of Mr. Jackson's professional team to communicate with him because his handlers at the time continued to change his telephone numbers in order to alienate Mr. Jackson from his family and professional staff, including Ms. Bain.

**Retention of Counsel**

48. When Ms. Bain's attempts to resolve these contractual matters failed, she retained the law firm of Cahn & Samuels, LLP to bring suit on her behalf.

49. On May 5, 2009, Cahn & Samuels, LLP filed suit in the United States District Court for the District of Columbia. The case was styled *Raymone K. Bain and Davis, Bain & Associates, Inc. vs. Michael J. Jackson and MJJ Productions, Inc.*, CA No. 1:09-cv-00826-RCL ("Underlying Claim)."

50. From the time of filing through December 15, 2009, Ms. Bain and her firm, Davis, Bain & Associates, Inc. were represented by Cahn & Samuels in the Underlying Claim.

51. Prior to termination of representation by Cahn & Samuels, LLP, Ms. Bain and Davis, Bain & Associates, Inc. retained Willie E. Gary, Linnes Finney, Jr. and the law firm of Gary, Williams, Finney, Lewis, Watson & Sperando, P.L. to represent her in the Underlying Claim.

52. Willie E. Gary, Linnes Finney, Jr., the law firm of Gary, Williams, Finney, Lewis, Watson & Sperando, P.L. (collectively, "Gary Defendants"), and additional lawyers at their firm, entered their appearances in the Underlying Claim in the District of Columbia on December 18, 2009, and remained counsel to Ms. Bain and Davis, Bain & Associates, Inc. and their attorneys of record through October 12, 2010.

53. In addition, the Gary Defendants assisted Ms. Bain in the filing of creditor claims in Mr. Jackson's Estate following his death in June 2009, for the same claims set forth in her then-pending lawsuit in the District of Columbia, and for her unpaid 2008 salary, which they had neglected to include in her then-pending lawsuit.

54. Shortly before termination of the representation of Ms. Bain and Davis, Bain & Associates, Inc. by the Gary Defendants, Ms. Bain and Davis, Bain & Associates, Inc. retained Frederick D. Cooke and the law firm of Rubin, Winston, Diercks, Harris & Cooke, LLP to represent them.

55. Mr. Cooke entered his appearance in the Underlying Claim on October 4, 2010 and remained counsel of record in the trial court through the termination of those proceedings.

## Litigation of the Underlying Claim

56. Despite demand, the Jackson Defendants failed and refused to pay Ms. Bain the amounts to which she was entitled pursuant to the Personal Services Agreement.

57. Suit on the Underlying Claim was filed by Cahn & Samuels, LLP on May 5, 2009, before Mr. Jackson's death. Ms. Bain and Davis, Bain & Associates, Inc. were named as plaintiffs, although the asserted claims belonged to Ms. Bain alone. The defendants were Michael J. Jackson and his production company, MJJ Productions, Inc. ("Jackson Defendants"). The gravamen of the Complaint was that, pursuant to the Personal Services Agreement of May 30, 2006, Ms. Bain was due a fee of 10% of amounts earned by the Jackson Defendants that were generated by or due to the efforts of Ms. Bain and/or Ms. Bain's contacts.

58. As originally pleaded, the lawsuit contained three counts. Count I asserted a claim for breach of the Personal Services Agreement. Damages were calculated and requested of "not less than" $44,000,000. Count II asserted a claim for "breach of implied in fact contract/*quantum meruit*," and also requested "not less than" $44,000,000 in damages. Count III asserted a claim for "unjust enrichment" and also requested the same quantum of damages. A true and correct copy of the Complaint is attached hereto and incorporated by reference herein as Exhibit 6.

59. On June 18, 2009, the Jackson Defendants filed a motion to dismiss, which was predicated on the alleged Release that Ms. Bain and Mr. Jackson had purportedly signed. In their motion, the Jackson Defendants asserted—contrary to the representations made by Mr.

McMillen at the time it was signed and by Mr. Jackson in his later Letter of April 24th — that the alleged Release settled and resolved all of Ms. Bain's rights under the Personal Services Agreement, including rights in deals that had not yet yielded financial returns.

60. Cahn & Samuels, LLP filed an opposition to the motion to dismiss, in which it argued, *inter alia*, that if the alleged Release were to be considered then the motion to dismiss should be converted to a motion for summary judgment, and that summary judgment should not be entertained prior to discovery.

61. While the motion to dismiss (or for summary judgment) was being briefed, Mr. Jackson died, and the litigation was stayed pending appointment of an Executor of his Estate.

62. While the stay was in effect, differences arose between Ms. Bain and her then counsel, Cahn & Samuels, LLP. The stay was lifted on November 20, 2009 and Maurice Cahn, Frederick N. Samuels and Cahn & Samuels, LLP moved to withdraw their appearance. Their motion was granted on December 15, 2009.

63. On or about November 29, 2009, after differences arose between plaintiffs and the Cahn Firm and before they withdrew, plaintiffs retained the Gary Firm to represent them in the Underlying Claim. The Gary Defendants entered their appearance in the Underlying Claim on December 18, 2009, and thereupon assumed the responsibility to promote, protect and preserve Ms. Bain's valuable claims against the Jackson Defendants.

64. After they entered the case the Gary Defendants sought to amend the Complaint to add a fraud in the inducement count, did not make or propose any other significant amendments to the Complaint, despite the fact that the alleged Release that Ms. Bain had been induced to sign upon specific representations had surfaced with what purported to be Michael Jackson's signature but was in fact a forgery; despite the fact that Michel Jackson had died after the

original Complaint was filed and it was therefore known that the funds that were expected to be

derived from a series of live concerts—and which formed the basis of the damage claim in the

Complaint—would not be generated; and despite the fact that it was by then known that MJC

was being used to make some of the deals and receive some of the funds generated by Ms.

Bain's efforts and/or those of her contacts.

65. By the time the Gary Defendants entered the Underlying Litigation, alternative

revenue sources were being developed in lieu of the previously scheduled live concerts, but the

Gary Defendants did not identify them or seek an accounting of them.  Instead, they continued to

seek damages based on events that they knew did not occur and could not occur because of Mr.

Jackson's death.

66. On information and belief, the alternative revenue sources being developed included,

but were not limited to, creation and sale of a movie, a DVD and a CD made from raw footage of

Mr. Jackson rehearsing for the live concerts, titled "This is It", that  generated approximately

$500 million from Sony;  a deal with Viacom to broadcast the movie, that generated

approximately $60 million; a merchandising deal with Bravado that generated a substantial sum;

advanced ticket sales for the live concerts that, instead of being refunded, were converted to a

souvenir ticket at the option of the holder, that generated approximately $380 million; and other

revenue sources which together totaled over $1 billion.

67. Although they failed to seek leave to amend the Complaint in these important

respects, on January 4, 2010, the Gary Defendants filed a supplemental memorandum in

opposition to the motion to dismiss (or for summary judgment), which included the Affidavit of

an expert in questioned documents, who opined that what purported to be the signature of

Michael Jackson on the alleged Release, was probably not his signature. A true and correct copy of the Affidavit is attached hereto and incorporated by reference herein as Exhibit 7.

68. On February 1, 2010, the Court entered an Order converting the pending motion to dismiss to one for summary judgment, and directed the filing of additional submissions.

69. On March 9, 2010, the Gary Defendants responded to the Court's Order directing the filing of additional submissions, by filing additional affidavits in support of the opposition to what was by then a motion for summary judgment.

70. In sum and substance, the additional affidavits outlined additional discovery the Gary Defendants intended to undertake if permitted to do so, and provided parol evidence in an attempt to vary or contradict the terms of the alleged Release.

71. The additional affidavits did not advise the Court of the April 24th Letter, dated four months after the date of the alleged Release, in which Mr. Jackson denied authorizing or executing the alleged Release, denied ever terminating Ms. Bain's services, denied ever terminating any of his agreements with her, asked her to continue to work on his behalf, and asked her to continue in her role as his general manager and President/COO of the Michael Jackson Company. When Plaintiff told the Gary Defendants that Mr. Jackson had sent her a letter disavowing any knowledge of the alleged release and asking her to continue her work, but that she could not find it, the Gary Defendants advised her that if she could not find it they could not raise it in opposition to the Jackson Defendants' motion for summary judgment.

72. Regardless of whether the additional evidence the Gary Defendants did submit should have been sufficient to defeat summary judgment, the April 24th Letter that they did not mention would have been virtually dispositive of the matter. The fact that neither Ms. Bain nor the Gary

Defendants then had the letter in their possession was no reason not to assert its existence and ask the Court for additional time and discovery to locate it.

73. While the motion for summary judgment was being considered by the Court, Ms. Bain and Defendant Willie E. Gary communicated about the status of the matter, and about what would happen if the motion were granted. During these communications, Mr. Gary outlined the steps he would take in that event, including filing a motion for reconsideration, filing a notice of appeal, and associating with appellate counsel.

74. On May 7, 2010, the Court granted summary judgment in favor of the Jackson Defendants. A true and correct copy of the Court's order is attached hereto and incorporated by reference herein as Exhibit 8. In substance, the Court implicitly ruled that the alleged Release was in fact signed by Michael Jackson. It then explicitly ruled that the language of the alleged Release was clear and unambiguous on its face, thus precluding parol evidence to vary or contradict its terms; that the facts and law that the Gary Defendants proffered to show fraud in the inducement by concealment of the status of various projects for which Ms. Bain claimed a fee were insufficient to do so; that the facts and law that the Gary Defendants proffered to show that Ms. Bain could not in the exercise of due diligence have discovered the status of various projects for which she claimed a fee were insufficient to do so; that the facts and law that the Gary Defendants proffered to show that the alleged Release was voidable under the doctrine of mistake were insufficient to do so; and that the equitable claims for *quantum meruit* and unjust enrichment were not viable.

75. Ms. Bain learned of the adverse judgment not from her counsel, but from the press. She immediately communicated with Defendant Willie E. Gary and faxed him a copy of the Court's Memorandum Opinion. Ms. Bain communicated with Mr. Gary again, and he repeated

his promises to file a motion for reconsideration, file a notice of appeal, and associate with other counsel with whom he had worked previously to pursue the appeal. He kept none of these promises. He also claimed to have associated with counsel in California to pursue the same claims that had just been adversely decided on the merits in the District of Columbia. .

76. After failing to seek leave to amend the Complaint as discussed above, which under the Rules would likely have been granted; failing to marshal and present appropriate legal arguments and facts to support Ms. Bain's valid claims; and failing to apprise the Court of the existence of the critical April 24th Letter; the Gary Defendants compounded their negligence by failing to timely move for reconsideration of, and timely file a notice of appeal from, the adverse judgment. The time to appeal expired on June 6, 2010, while the Gary Defendants continued to represent Ms. Bain and Davis, Bain & Associates, Inc.

77. In late June 2010, Defendant Willie E. Gary advised Ms. Bain to retain counsel in California to open a second front in pursuit of her claims. Ms. Bain consulted with counsel in California, who upon review of the status of the Underlying Litigation raised questions about what remained to be pursued in light of the Court's Order of May 7, 2010 and the absence of a timely request for reconsideration or notice of appeal.

78. On or about July 1, 2010, almost a month after the time to appeal had expired with no motion for reconsideration or notice of appeal having been filed, Defendant Willie E. Gary belatedly admitted those facts to Ms. Bain. Ms. Bain was appalled, and despite the fact that the Gary Defendants still represented her, on July 6, 2010 she filed a *pro se* motion to enlarge the time to file a notice of appeal.

79. Meanwhile, in late June or early July 2010, a real estate consultant for Michael Jackson who had been working out of Ms. Bain's office returned a box of real estate documents

that he had been working on to her office. Ms. Bain went through those documents in August 2010, while she was still represented by the Gary Defendants, and found the April 24th Letter in a folder dealing with property in Las Vegas that Michael Jackson had wanted to buy. Michael Jackson's April 24th Letter apparently had been filed there because, in addition to denying authorizing or executing the alleged Release, denying ever terminating Ms. Bain's services, denying ever terminating any of his agreements with her, asking her to continue as his General Manager and asking her to continue as President/COO of the Michael Jackson Company, the letter also instructed Ms. Bain to continue her work to acquire the Las Vegas property.

80. On or about July 3, 2010, after learning that the Gary Defendants had failed to move for reconsideration or file a notice of appeal, Ms. Bain terminated the services of the Gary Defendants. After doing so and filing the notice of appeal *pro se*, she sought other counsel.

81. On October 4, 2010, Frederick Cooke of the law firm of Rubin, Winston, Diercks, Harris & Cooke, LLP entered an appearance on behalf of Ms. Bain and Davis, Bain & Associates, Inc. and simultaneously filed a motion to set aside the judgment under Fed. R. Civ. P. 60(b), on the ground that the April 24th Letter was "newly discovered evidence."

82. On October 15, 2010, the Court denied Ms. Bain's *pro se* motion to extend the time to appeal from the Court's dispositive grant of summary judgment to the Jackson Defendants. The Court held in substance that the failure of the Gary Defendants to timely file the notice of appeal as promised was insufficient reason to extend the time to appeal, and that Ms. Bain was bound by her attorneys' negligence. A true and correct copy of the Court's Memorandum Opinion is attached hereto and incorporated by reference herein as Exhibit 9.

83. More than a year and a half later, on June 7, 2012, the Court denied Ms. Bain's motion to set aside the judgment, ruling in substance that the April 24th Letter was not "newly discovered evidence" because, regardless of when it was located, it was known to exist before the dispositive order was entered, yet was not mentioned by the Gary Defendants in opposition to the motion for summary judgment. A true and correct copy of the Court's Memorandum Opinion is attached hereto and incorporated by reference herein as Exhibit 10.

84. On June 28, 2012, Ms. Bain timely appealed the denial of her motion to set aside the judgment. That appeal was pending at the time this Complaint was filed.

85. As of this time, while the matter is pending on appeal, it is unknown whether the negligence of the Gary Defendants described below has resulted in the total loss of Ms. Bain's valuable claims, or in the alternative has substantially impaired and reduced their value. She therefore pleads her case in the alternative.

**Count I**
**(Legal Malpractice: Loss of the Claim)**

86. The allegations of ¶¶ 1-85 are incorporated by reference herein, and Ms. Bain adds that at the times described herein, the Gary Defendants owed her professional duties, including but not limited to the duties of competent, careful and zealous representation, and the duty to keep her apprised of the status of her case, all in accordance with the applicable standard of care.

87. The Gary Defendants breached their professional duties to Ms. Bain and violated the applicable standard of care in that, among other things, they: failed to seek leave to amend the Complaint as necessary and appropriate; they failed to assert all of Ms. Bain's cognizable and valid claims and causes of action; they failed to marshal available facts and present available arguments to support the claims and causes they did assert and defeat the motion for summary judgment, specifically including their failure to assert the existence and argue the effect of the

21

April 24th Letter; they failed to keep Ms. Bain informed and apprise her of the status of her case; and they failed to preserve her rights by timely filing a motion for reconsideration of and/or notice of appeal from the adverse judgment improperly entered against her.

88. As a direct and proximate result of the negligence of the Gary Defendants, Ms. Bain incurred substantial costs and expenses, including costs and attorneys' fees, in an effort to mitigate her damages.

89. As a direct and proximate result of the negligence of the Gary Defendants, Ms. Bain lost her valuable claims against the Jackson Defendants.

90. As a direct and proximate result of the negligence of the Gary Defendants, Ms. Bain was damaged in an amount to be proven at trial, but not less than 10% of the amounts earned by Michael Jackson, the Estate of Michael Jackson, MJJ Productions or The Michael Jackson Company on contracts entered into by or on behalf of Mr. Jackson, MJJ Productions or The Michael Jackson Company, that were generated by or due to the direct efforts of Ms. Bain and/or Ms. Bain's contacts. On information and belief, the amounts earned exceed $2 billion dollars, 10% of which is $200 million.

WHEREFORE, the premises considered, Plaintiff Raymone K. Bain demands judgment against Defendants Gary, Williams, Parenti, Watson and Sperando, P.L. (previously known as Gary, Williams, Finney, Lewis, Watson & Sperando, P.L.), Willie E. Gary and Linnes Finney, Jr., jointly and severally, in an amount to be proven at trial, but not less than Two Hundred Million Dollars ($200,000,000), plus interest, costs, and such other and further relief as the Court deems meet.

**Count II**
(Legal Malpractice of the Gary Defendants: Impairment in Value)

91. The allegations of ¶¶ 1-88 are incorporated by reference herein, and Ms. Bain adds that as a direct and proximate result of the negligence of the Gary Defendants aforesaid, her claims against the Jackson Defendants were substantially reduced in value.

92. As a direct and proximate result of the negligence of the Gary Defendants and the impairment in value of her claims, Ms. Bain was damaged in an amount to be proven at trial, but not less than $100 million.

WHEREFORE, the premises considered, Plaintiff Raymone K. Bain demands judgment against Defendants Gary, Williams, Parenti, Watson and Sperando, P.L., (previously known as Gary, Williams, Finney, Lewis, Watson & Sperando, P.L.), Willie E. Gary and Linnes Finney, Jr., jointly and severally, in an amount to be proven at trial, but not less than One Hundred Million Dollars ($100,000,000), plus interest, costs, and such other and further relief as the Court deems meet.

JOSEPH, GREENWALD & LAAKE. P.A.

By:

Steven M. Pavsner, No. 912220
6404 Ivy Lane # 400
Greenbelt, MD 20770
301.220.2200 (phone)
240.553.1735 (fax)
spavsner@jgllaw.com

## JURY DEMAND

Plaintiff demands trial by jury.

Steven M. Pavsner, No. 912220

*Davis, Bain and Associates, Inc.*
*4770 Dexter Street, N.W.*
*Washington, D.C. 20007*
*(202) 337-5595; Fax: (202) 337-6563*
*Email Address: RBain28460@aol.com*

May 30, 2006

I, Michael Jackson, as Founder/Chief Executive Officer of The Michael Jackson Company, do hereby authorize Raymone K. Bain to incorporate my new company, The Michael Jackson Company, and to trademark the new logo which will be associated with my new company, and oversees all business associated with establishing said company.

In hereby authorizing Raymone K. Bain to perform the above said services, I appoint her as President/COO of said corporation. Ms. Bain shall use her best efforts in performing said services which are outlined as follows and all other business related to The Michael Jackson Company, and shall report directly to me with regards to any and all of my personal and professional business matters, which includes, but shall not be limited to:

**\*Accounting**
   a.) retaining auditors, including music auditors
   b.) retaining new accounting teams
**\*Legal Representation**
   a.) retaining representation regarding Sony music/catalog
   b.) retaining personal legal counsel
**\*Investors/Board of Directors for The Michael Jackson Company**
   a.) Schedule meeting w/ proposed Investors/Board of Directors
       between June 16th-June 30th, 2006

**\*Website**
   a.) authorization to create a website in the best interest
       of Mr. Jackson
**\*Appointment and supervision of staff for The Michael Jackson Company**
**\*Real property**
   a.) overseeing purchases and refinancing
**\*Business Opportunities:**
   a.) pursuing new business opportunities on behalf of Michael
       Jackson and the Michael Jackson Company. As compensation,
       Bain shall receive 10% Finder's fee of any Agreement(s) entered
       into by Michael Jackson, or the Michael Jackson Company,
       generated by, or due to the direct efforts of Bain and/or Bain's
       contacts.
**\*Term:**   Three (3) years.
**\*Jurisdiction:** Washington, D.C.

EXHIBIT
1

Case 1:13-cv-00848-RCL   Document 1-1   Filed 06/06/13   Page 25 of 77

FROM : SCHUETZNER   Case 1:09-cv-00826-RCL   Document 48-2   Filed 01/04/10   Page 14 of 39   JUN. 04 2010 04:08PM P11
PHONE NO. : 713 765 0832

*Davis, Bain and Associates, Inc.*
*4770 Dexter Street, N.W.*
*Washington, D.C. 20007*
*(202) 337-5595; Fax: (202) 337-6563*
*Email Address:  RBain28460@aol.com*

May 30, 2006

I, Michael Jackson, do hereby appoint Raymone K. Bain as
General Manager, overseeing my personal and business
affairs, as directed by me.  Within my organization, Ms. Bain
shall have full access to information regarding matters relating
to me and my companies.  As a trusted advisor, Ms. Bain shall
act as my liaison, and on my behalf, to all accountants, business
managers, advisors, attorneys, current and former business managers,
auditors, and other professionals, or individuals, who are currently
providing, or have provided services to me, and my companies,
in the past.

This authorization supercedes and cancels any and all other
authorizations approved by me, which could be deemed a conflict
of the responsibilities set forth in this Letter of Authorization.

_____
Michael Jackson

WITNESS _____  6.1.06

6-1-06

EXHIBIT
2

Mr. MICHAEL JACKSON
d/b/a MIJAC MUSIC & MIRAN PUBLISHING CORP. (BMI)
c/o Raymone K. Bain
Davis, Bain and Associates, Inc.
4770 Dexter Street, N.W.
Washington, DC 20007

Dated: As of June 1, 2006

Warner/Chappell Music, Inc.
10585 Santa Monica Boulevard
Los Angeles, CA 90025
Attn: Edward P. Pierson
Executive Vice President,
Legal & Business Affairs &
General Counsel

Reference is hereby made to the various agreements between you and me (the "Agreements"). This is to advise that I have appointed Raymone K. Bain, effective as of the date hereof, as my agent for purposes of approving those uses of compositions subject to such Agreements, which require my approval. For the avoidance of doubt, an approval from Ms. Bain shall be deemed to be an approval from me.

The foregoing authorization shall remain in full force and effect until modified or terminated in writing by me.

Thank you very much for your cooperation and attention to this matter.

Very truly yours,

MICHAEL JACKSON

EXHIBIT
3

Case 1:13-cv-00848-RCL   Document 1-1   Filed 06/06/13   Page 27 of 77

Case 1:09-cv-00826-RCL   Document 28-3   Filed 07/02/09   Page 2 of 6
Case 1:09-cv-00826-JR   Document 24-3   Filed 06/18/2009   Page 2 of 6

02/29/08  16:16 FAX                                                              ☒002

## PAYMENT AND RELEASE AGREEMENT

This Settlement and Release Agreement (the "Agreement") is made and entered into as of the 27th day December 2007 by and among Ms. Raymone Bain (referred to herein as "you" or "your") with an address of 4770 Dexter Street, NW Washington, D.C. 20007 on the one hand and Mr. Michael Joseph Jackson ("Mr. Jackson") and his personal and business related entities (individually and/or collectively referred to herein as the "Jackson Parties") on the other hand.

In consideration of the mutual promises and understanding herein contained, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows: *$ 215, 820.25 - cash disbursements, loans, cash and check*
*$ 270,000.00 - consultant's fees/etc ($ 488,820.25 acc)*

1.    Mr. Jackson shall render a payment made payable to you in the amount of *Four hundred eighty eight thousand eight hundred eighty - twenty* Dollars ($488,820) as full and final satisfaction of any all monies, known or unknown, to be owed to you by the Jackson Parties with respect to any and all *believed on* agreements whether verbal or written that you may have entered into with the Jackson Parties from the beginning of time until December 27, 2007 (the "Payment").

2.    Except as otherwise set forth herein, in consideration of the Payment and other consideration provided herein, you on behalf of yourself, your respective predecessors in interest, successors and assigns, representatives, partners, parents, subsidiaries, affiliates, members, officers, directors, agents, attorneys, employees, insurers, donees and licensees and each of them as applicable, do hereby absolutely, fully and forever release, relieve, waive, relinquish and discharge the Jackson Parties and each of their respective predecessors in interest, successors and assigns, representatives, partners, parents, subsidiaries, affiliates, members, officers, directors, agents, attorneys, employees, insurers, donees and licensees and each of them as applicable of and from any and all manner of action or actions, suits, debts, liabilities, demands, claims, obligations, costs, expenses, sums of money, controversies, damages, accounts, reckonings, and liens of every kind or nature whatsoever, whether known or unknown, suspected or unsuspected which you shall or may have, own or hold, or which they at any time heretofore had owned or held against the Jackson Parties by reason of, arising out of or in connection with any matter whatsoever.

3.    Reference is hereby made to the Confidentiality Agreement signed by you dated June 1, 2006 ("Confidentiality Agreement"). You hereby ratify and affirm the terms and conditions of the Confidentiality Agreement attached hereto including, but not limited to, keeping matters related to Mr. Jackson, and the Payment and/or the reasons or circumstances of this Agreement, strictly confidential.

4.    You shall indemnify, defend, and hold harmless the Jackson Parties from and against any and all costs, claims, damages, judgments, penalties and expenses of any kind (including, without limitation, reasonable attorneys' fees and litigation costs) arising from this Agreement including, but not limited to, any services rendered by Davis, Bain and Associates, Inc., and its respective representatives, parents, affiliates, subsidiaries, officers, employees, directors, agents, successors and assigns.



Case 1:13-cv-00848-RCL   Document 1-1   Filed 06/06/13   Page 28 of 77

Case 1:09-cv-00826-RCL   Document 28-3   Filed 07/02/09   Page 3 of 6
Case 1:09-cv-00826-JR   Document 24-3   Filed 06/18/2009   Page 3 of 6

02/29/08  16:17 FAX                                                    ☒003

5. Waiver of Rights Under California Civil Code Section 1542. You understand and agree that the release set forth above shall extend to any and all claims related to the matters described above, of every nature and kind whatsoever, whether such claims are known or unknown, suspected or unsuspected, and any and all rights under Section 1542 of the California Civil Code ("Section 1542") within the scope of the release set forth above are expressly waived. You acknowledge that you have read Section 1542, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

You also understand that Section 1542 gives you the right not to release existing claims of which you are not now aware of and do not suspect to exist, unless you voluntarily choose to waive this right. Even though you are aware of this right, you nevertheless hereby voluntarily waive the right described in Section 1542, and elect to assume all risks for claims that now exist in your favor, known or unknown, arising from the subject matter of the release set forth above, and expressly waive any rights under any other statutes or common law principals of similar effect.

6. This Agreement contains the entire understanding between and among the parties hereto and supersedes any and all prior understandings, agreements, representations, covenants, warranties, and releases, express or implied, written or oral, between any of the parties concerning the subject matter of this Agreement. No changes or modifications to this Agreement or any new agreement shall be made between the parties hereto unless expressly set forth in writing. Nothing herein shall be construed to be an admission or acknowledgment of liability, obligation, misconduct or wrongdoing or any kind or nature whatsoever. This Agreement has been entered into in the state of New York and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York. All claims or disputes which may arise in relating hereto shall be subject to binding arbitration. In the event of any action, suit or proceeding arising from or based upon this Agreement is brought, the prevailing party shall be entitled to recover from the other its reasonable attorney's fees in connection therewith in addition to the costs of such action, suit or proceeding.

7. You acknowledge that: (a) you have been represented (or had no opportunity to be represented) by independent legal counsel of Your own choice throughout all negotiations that preceded the execution of this Agreement and that you have executed this Agreement with the consent and on the advice of such independent legal counsel or waived the right to do so; (b) you have carefully and thoroughly read this Agreement in its entirety and fully understand its terms and effects, that the terms hereof

2

Case 1:13-cv-00848-RCL   Document 1-1   Filed 06/06/13   Page 29 of 77

Case 1:09-cv-00826-RCL   Document 28-3   Filed 07/02/09   Page 4 of 6
Case 1:09-cv-00826-JR   Document 24-3   Filed 06/18/2009   Page 4 of 6

02/29/08  16:17 FAX                                                    ☒004

are fair and reasonable; (c) you have executed this Agreement willingly and without
acting under any duress; and (d) that you shall be bound hereby in all respects.

   8.   If any provision of this Agreement shall be held void, voidable, invalid, or
inoperative, no other provision of this Agreement shall be affected as a result thereof.
This Agreement shall inure the benefit of, and shall be binding upon the successors, heirs
and assigns of the parties hereto and each of them.

   9.   This Agreement shall become effective upon receipt of the Payment.  If
the foregoing accurately sets forth our agreement, please so indicate by signing where
indicated below.

ACCEPTED AND AGREED:

By:  _____         By:  _____
     Raymone Bain                            Mr. Michael J. Jackson

3

04/25/2008  16:21    0000000000                                    PAGE  01/01
04/24/2008  14:19

# MICHAEL JACKSON

April 24, 2008

Ms. Raymone K. Bain
4770 Dexter Street, N.W.
Washington, D.C. 20007

Dear Raymone:

I have never terminated your services nor did I null and void any of your
Agreements.

I know nothing about a release form.  I neither authorized or signed the
same.

Therefore, I am authorizing you to continue to communicate with
Mr. Yakoob regarding the Sultan's property in Las Vegas, and to continue
your role as my General Manager and President/COO of The Michael
Jackson Company.

Thank you.

Sincerely,


Michael J. Jackson

EXHIBIT
5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Raymone K. Bain                    )
4770 Dexter Street, NW        )
Washington, D.C.  20007      )
      (Plaintiff)            )
                                 )
and                                 )
                                 )
Davis, Bain & Associates, Inc.    )
4770 Dexter Street, NW        )
Washington, D.C.  20007      )
      (Plaintiff)            )
                                 )
         v.                    )       Civil Action No.:
                                 )
Michael J. Jackson              )
100 N. Carolwood Drive       )
Los Angeles, CA 90077-3515   )
      (Defendant)        )
                                 )
MJJ Productions, Inc.          )
562 Homewood Road.        )
Los Angeles, CA  90049-1906   )
      (Defendant)        )

## COMPLAINT

Plaintiffs, Raymone K. Bain and Davis Bain & Associates (hereinafter collectively referred to as "Plaintiffs") complaint against Michael J. Jackson and MJJ Productions (hereinafter referred to collectively as "Defendants") as follows:

## NATURE OF THE ACTION

1.    This is an action for breach of contract, quantum meruit, and unjust enrichment under the laws and the common law of the District of Columbia.

- 1 -



EXHIBIT
tabbies
6

### THE PARTIES

2.    Plaintiff, Raymone K. Bain, is a natural person and citizen of the District of Columbia. Ms. Bain is CEO and Co-Founder of the public relations firm of Davis, Bain & Associates, Inc., and President and COO of the Michael Jackson Company, LLC. In addition to International pop icon, Michael Jackson, Ms. Bain has represented many high profile public figures in the sports, entertainment and political fields including, 10-time Grammy-Award winning singer, songwriter, producer, and entertainment mogul, Kenneth "Babyface" Edmonds; recording group Boyz II Men; Janet Jackson; "The Kings of Comedy," a/k/a Steve Harvey, the late Bernie Mac, D.L. Hughley, and Cedric "The Entertainer"; the Estate of the late Sammy Davis, Jr.; Boxing legends "Marvelous" Marvin Hagler and Thomas "Hit Man" Hearns; top-ranked International tennis star Serena Williams; and former D.C. Mayor and current Washington D.C. City Council Member, Marion S. Barry, Jr. among many others.

3.    Plaintiff, Davis, Bain & Associates, Inc., is a corporation organized under the laws of the District of Columbia having a place of business at 4770 Dexter Street, NW, Washington, D.C. 20007.

4.      Defendant, Michael J. Jackson, (hereinafter Mr. Jackson) is a singer, songwriter, investor, collector, businessman, and international pop icon, who has sold over 1 billion records worldwide.   Upon information and belief, Mr. Jackson, formerly residing in The Kingdom of Bahrain, Ireland, and Las Vegas,   Nevada, is a resident, citizen and domiciliary of the State of California.

5.      Upon information and belief, Defendant MJJ Productions, Inc. is a California corporation at one time receiving mail, and having an address of 4770 Dexter Street, N.W. Washington, D.C.  20007.

## JURISDICTION

6.      This Court has jurisdiction over the parties and this action pursuant to 28 U.S.C. 1332, the Long-Arm Statute of the District of Columbia, and by contract.  Venue is proper under 28 U.S.C. 1391.

## FACTS COMMON TO ALL COUNTS

7.      On or about December 2003, Mr. Jackson hired Davis, Bain & Associates, Inc., as his public relations firm and appointed Ms. Bain as his personal spokesperson and publicist.

8.      As his publicist, Ms. Bain performed public relations consultation services for Mr. Jackson including planning, coordination, and supervision of proactive media strategies; crisis management and damage control; preparation and distribution of press releases; and preparation of promotional materials, supervision and coordination of media appearances,

- 3 -

interviews and press conferences, special projects and personal appearances. As his spokesperson, Plaintiff became Defendant's official voice for all public matters, including his child molestation trial which began in January 2005, and lasted for approximately six months. Ms. Bain continued her duties as spokesperson and publicist after Mr. Jackson's acquittal.

9.    On or about May 30, 2006, Mr. Jackson expanded Ms. Bain's role entering into a written agreement (hereinafter "the Personal Services Agreement") directing Ms. Bain to incorporate a new company for Mr. Jackson, namely, The Michael Jackson Company, Inc., (hereinafter "MJC", which later became The Michael Jackson Company, LLC), and appointing Ms. Bain President/COO of the MJC and outlining her respective responsibilities. A true and correct copy of the Personal Services Agreement is attached hereto as Exhibit A.

10.    Mr. Jackson signed a second document (hereinafter "the General Manager Agreement") appointing Ms. Bain as his personal General Manager. A true and correct copy of the General Manager Agreement is attached hereto as Exhibit B.

11.    According to the Personal Services Agreement, Ms. Bain is to receive a 10% fee of any Agreements entered into by Mr. Jackson or the MJC, generated by, or due to the direct efforts of Ms. Bain, and/or Ms. Bain's contacts.

12. Throughout the term of the Personal Services Agreement, Ms. Bain has performed her duties as COO faithfully and diligently.

13. At the time of entering into her expanded role with Mr. Jackson under the Personal Services Agreement, Ms. Bain was not aware of the extent, magnitude and severity of the legal, financial and other pressing issues faced by Mr. Jackson which, if not handled immediately and properly, would have caused Mr. Jackson substantial harm.

14. As Mr. Jackson had no manager to coordinate his creative ventures, Ms. Bain, at Mr. Jackson's direction, immediately contacted prospective managers, who were capable of servicing an entertainer of Mr. Jackson's magnitude, and began scheduling meetings with said individuals, beginning in November, 2006, in Ireland. In addition, Ms. Bain scheduled meetings, also held in Ireland, between Mr. Jackson and recording artists, producers and songwriters.

15. Ms. Bain recruited, introduced to Mr. Jackson for his approval, and hired on Mr. Jackson's behalf, an accounting team and well respected and experienced legal counsel including: former U.S. Attorney General Benjamin Civiletti, Esq. and Gregory Cross, Esq. of Venable LLP; L. Londell McMillan, first of the McMillan Firm, then of the law firm of Dewey & LeBouf, LLP; and Peter Lopez, Esq., of Kleinburg, Lopez, Lange, Cuddy and Edel, LLP.

16. Ms. Bain instructed the initiation of and supervised Mr. Jackson's accounting team in an audit of Mr. Jackson's personal and professional

- 5 -

finances and receivables to fully inform Mr. Jackson of his financial condition.

17. Ms. Bain averted imminent foreclosure of several of Mr. Jackson's properties in 2006 and 2007 by arranging emergency refinancings. She also supervised the management and payment of Mr. Jackson's day to day, weekly and monthly bills, and supervised the transition of Mr. Jackson's and his children's relocations from France to Ireland, and encouraged and supervised his move from Ireland back to the United States, specifically to Las Vegas, Nevada on December 23, 2006

18. Ms. Bain arranged housing, abroad and in the United States, and oversaw Mr. Jackson's day to day living requirements including, but not limited to: insurances, personal requirements and expenses, travel, security and personal staffs, and payments to employees at Neverland Valley Ranch (Mr. Jackson's former residence) and Hayvenhurst (the Jackson family residence).

19. Ms. Bain identified and hired a new personnel company to take over responsibilities of the previous payroll company, which had abruptly resigned, in order to continue to pay employees of Hayvenhurst, Neverland Valley Ranch, and other employees of Mr. Jackson.

20. Mr. Jackson appointed Ms. Bain as his agent to review and approve music usage requests from Warner/Chappell Music, Inc., relating to the MIJAC music catalog. A true and correct copy of Ms. Bain's agency appointment

is attached hereto as Exhibit C.  These requests generated over ten million of dollars ($10,000,000) of annual income.

21.  Ms. Bain directed and supervised a team of accountants who intervened on Mr. Jackson's behalf with the California Department of Labor to address complaints filed by Neverland Valley Ranch employees.  Ms. Bain also supervised an accounting team that represented Mr. Jackson in numerous audits originated by the California Department of Labor.

22.  Ms. Bain approved and supervised the payment of disbursements including those to security personnel, employees, consultants, creditors, vendors, attorneys, accountants, dancers, choreographers, travel agencies, personal physicians, and all others requiring payments.

23.  Ms. Bain supervised Mr. Jackson's accountants in the preparation, filing and payment of Mr. Jackson's taxes, both personal and property.

24.  Ms. Bain supervised and coordinated the activities of six law firms which represented Mr. Jackson, and managed the litigation of cases on Mr. Jackson's behalf, (including settlements), which, if not handled properly, could have caused Mr. Jackson to forfeit his share of the SONY/ATV music catalog (which includes the Beatles Catalog).

25.  Ms. Bain was appointed by Mr. Jackson as a trustee of MJ Publishing Trust, and as a member of the SONY/ATV Board of Directors, SONY Music Corporation, to represent Mr. Jackson's best interests.

26.  Upon Mr. Jackson's return to the United States in December 2006, Ms. Bain conceived of and encouraged Mr. Jackson to participate in and sanction the

commemoration of the 25th anniversary of the release of Mr. Jackson's historic *Thriller* album. Ms. Bain worked closely with SONY Music and Legacy Records in the planning, marketing, and promotion of the project, and to structure a deal for a CD and related entertainment products (hereinafter the "*Thriller* deal"). Concurrently, Ms. Bain commenced a dialogue with respected award-winning producer, Ken Erlich, regarding Mr. Jackson's participation at the 2008 Grammy Awards, and related activities.

27. Upon information and belief, Mr. Jackson was compensated for the *Thriller* deal on or about December 6, 2007, (unbeknownst to Bain until mid February 2008), and the 25th anniversary CD was released on or about January 12, 2008.

28. Upon information and belief, over 3 million copies of the commemorative *Thriller* CD have been sold.

29. Beginning in January 2007, Ms. Bain initiated what became year long negotiations with Anchutz Entertainment Group, Inc. (hereinafter AEG) regarding a comprehensive entertainment deal for Mr. Jackson, which also included, at the time, development of the Neverland Valley Ranch, and recording and film projects. The entertainment deal also included several live performances by Mr. Jackson at the O2 Arena in London, England.

30. On several occasions, Ms. Bain met with AEG representatives including Messrs. Randy Phillips, Tim Lewinski, Paul Gongaware, and John Meglin. Mr. Jackson was present at the majority of those meetings. In addition, Ms. Bain met with representatives from AEG's film division regarding Mr.

Jackson's interest in producing films including film projects directed to Pharaoh Tutankhamun "King Tut", *Thriller* and CGI Animation.

31. Ms. Bain recruited, organized, served on, and convened a six-member Financial Advisory Board for Mr. Jackson, and the MJC, comprised of legal, financial and business advisors to assist Mr. Jackson regarding refinancing the loan that Mr. Jackson had previously taken out against the SONY/ATV music catalog.

32. Due to the complex nature of the refinancing, and its many wide-ranging implications, the Financial Advisory Board conferred with Mr. Jackson regularly from about April 2007 to December 2007. Ms. Bain actively participated as an integral member of the Financial Advisory Board. She scheduled and coordinated conference calls and meetings, and guaranteed Mr. Jackson's participation therein.

33. The loan on the SONY/ATV music catalog was refinanced in three phases. All phases were completed on or about December 31, 2007. The refinancing provided Mr. Jackson, personally, over twenty-five million dollars ($25,000,000) in cash. An additional sixteen million plus dollars ($16,000,000) was allocated to Mr. Jackson to pay off various debts, including his accounts payables (vendors, travel agents, attorneys, accountants, consultants and other creditors); and, monies to pay agreed upon legal settlements.

34. Upon completion of the loan refinancing, Mr. Jackson compensated every member of the Financial Advisory Board except Ms. Bain and the only other female member.

35. During the final days of the loan's refinancing, Mr. Jackson's communications with Ms. Bain, who up to that point spoke to Mr. Jackson several times a day, diminished to sporadic. At that time, Mr. Jackson went as far as to discontinue communications with his accountants, and authorized all monies disbursed from the SONY/ATV loan refinancing to be transferred into a law firm's escrow account, rather than to his accountants for disbursement of payments.

36. Despite this, Ms. Bain continued to perform her duties to the best of her ability pursuant to the terms of the Personal Services Agreement.

37. After the refinancing was complete, Mr. Jackson rebuffed all attempts by Ms. Bain to discuss her fee payments and other business matters.

38. Upon information and belief, several months after Ms. Bain last spoke with Mr. Jackson, Mr. Jackson, either individually or on behalf of MJJ Productions, Inc., signed an entertainment agreement with AEG.

39. On March 5, 2009, Mr. Jackson held a press conference in London, England to announce that he had signed an agreement with AEG, whereby he will perform a series of concerts in London, England beginning July 8, 2009, at the O2 arena. Media reports quote Randy Phillips of AEG as stating that the AEG deal is worth as much as four-hundred million dollars ($400,000,000) in revenue to Mr. Jackson. It is now widely known that

- 10 -

tickets have sold out for fifty (50) Jackson concert dates, and that these series of concerts are scheduled from July 2009 through February 2010.

40.     Ms. Bain's attempts to resolve the respective contractual matters involving Ms. Bain, consultants of the MJC, including the accountants and respective vendors, either directly, through attorneys, and/or surrogates, have failed.

## COUNT I:  BREACH OF CONTRACT
## PERSONAL SERVICES AGREEMENT

41.    Plaintiffs hereby reallege each of the allegations contained in paragraphs 1-41.

42.    The acts of Mr. Jackson described herein constitute breach of contract under the laws and common law of the District of Columbia.

43.    Ms. Bain and Mr. Jackson entered into a written contract, the Personal Services Agreement, wherein their mutual consent to the terms is manifested by their respective signatures.

44.    In consideration for the mutual promises contained in the Personal Services Agreement, Mr. Jackson agreed to pay Ms. Bain a fee of 10% of any agreements entered into by Mr. Jackson that are generated by or due to the efforts of Ms. Bain and/or Ms. Bain's contacts.

45.    Ms. Bain initiated and supervised the refinancing of the loan on the SONY/ATV music catalog.

46.    Mr. Jackson received at least twenty-five million dollars ($25,000,000) in cash proceeds from the loan refinancing due to Ms. Bain's efforts.

47.    Ms. Bain initiated and negotiated the 25th Anniversary *Thriller* commemorative deal.

48.    Upon information and belief, Mr. Jackson has been and continues to receive compensation for the 25th Anniversary *Thriller* commemorative deal.

49.    Ms. Bain initiated and participated in extensive negotiations with AEG regarding a comprehensive entertainment deal, including concerts.

- 12 -

50. Upon information and belief, Mr. Jackson and/or MJJ Productions executed an entertainment agreement with AEG.

51. Upon information and belief, Mr. Jackson has received compensation for the AEG agreement.

52. Mr. Jackson has breached the Personal Services Agreement by refusing to pay the 10% fee to Ms. Bain for: (i) the 25th Anniversary *Thriller* commemorative deal, (ii) the personal proceeds from the refinancing of the loan on the SONY/ATV music catalog, and (iii) the AEG agreement.

53. Ms. Bain has been directly and actually damaged by Mr. Jackson's conduct in this regard and will continue to be harmed both financially, and in other ways as a result of Mr. Jackson's conduct, in an amount to be proven at trial, but not less than $44,000,000.

WHEREFORE, Ms. Bain requests that this Court enter its judgment awarding damages to Ms. Bain in an amount to be proven at trial, but in any event not less than $44,000,000 plus attorney's fees and costs, and all other and further relief as may be just and appropriate under the circumstances.


## COUNT II:  BREACH OF IMPLIED IN FACT CONTRACT/QUANTUM MERUIT

54. Plaintiffs hereby reallege each of the allegations contained in paragraphs 1-53.

55. Pleading in the alternative, Plaintiffs provided valuable services to Mr. Jackson with the expectation of being compensated for such services.

56. Mr. Jackson accepted such services, which had value to Mr. Jackson.

- 13 -

57. Mr. Jackson was aware that Plaintiffs expected to be compensated for the services that were provided to Mr. Jackson.

58. Mr. Jackson is obligated to provide reasonable compensation for the services provided to him by Plaintiffs.

WHEREFORE, Plaintiffs request that this Court enter its judgment awarding damages to Bain in an amount to be proven at trial, but in any event not less than $44,000,000 plus attorney's fees and costs, and all other and further relief, both legal and equitable, as may be just and appropriate under the circumstances.

## COUNT III:  UNJUST ENRICHMENT

59. Plaintiffs hereby reallege each of the allegations contained in paragraphs 1-58.

60. Pleading in the further alternative, Plaintiffs conferred a benefit on Mr. Jackson by providing services for Mr. Jackson.

61. Mr. Jackson accepted such services and derived substantial benefits from those services.

62. Mr. Jackson failed to compensate Plaintiffs for services rendered.

63. The benefit referenced above flowed to Mr. Jackson and, under the circumstances; it would be inequitable for Mr. Jackson to retain the benefit.

WHEREFORE Plaintiffs request that this Court enter its judgment awarding damages to Plaintiffs in an amount to be proven at trial, but in any event not less than $44,000,000 plus attorney's fees and costs and all other and further relief, both legal and equitable, as may be just and appropriate under the circumstances.

## JURY DEMAND

Pursuant to Rule 38(b), Fed. R. Civ. P., and the Seventh Amendment to the United States Constitution, the Plaintiff hereby demands a trial by jury.

Respectfully submitted by

CAHN & SAMUELS, LLP
Attorneys for Plaintiff

Dated: May 5, 2009

Frederick N. Samuels, Esq.
DC Bar No. 436202
Maurice U. Cahn, Esq.
DC Bar No. 382559
William E. Bradley, Esq.
DC Bar No. 463695
George A. Metzenthin, Esq.
DC Bar No. 458415
1100 17th St., N.W., Ste. 401
Washington, D.C. 20036
(202) 331-8777 Phone
(202) 331-3838 FAX


**Of Counsel**
Law Offices of Rosalind Ray, PLLC
Rosalind Ray, Esq.
6856 Eastern Ave, Suite 208 and 308
Washington, D.C. 20012

## VERIFICATION OF COMPLAINT

I, Raymone K. Bain, declare that:

1. I am a named plaintiff in this civil action.

2. I have read the foregoing Complaint and am familiar with the allegations and statements

   contained therein.

3. To the best of my knowledge, information and belief, founded after reasonable inquiry,

   the allegations in the Complaint are well grounded in fact, are warranted by existing law

   or good faith argument for extension, modification, or establishment of new law.

4. The foregoing Complaint is not being filed for any improper purpose

5. I declare under penalty of perjury under the laws of the United States of

   America that the foregoing is true and correct.

5/5/09
Date

Raymone K. Bain

# Exhibit A

***Davis, Bain and Associates, Inc.***
***4770 Dexter Street, N.W.***
***Washington, D.C. 20007***
***(202) 337-5595; Fax: (202) 337-6563***
***Email Address: RBain28460@aol.com***

May 30, 2006

I, Michael Jackson, as Founder/Chief Executive Officer of The Michael Jackson Company, do hereby authorize Raymone K. Bain to incorporate my new company, The Michael Jackson Company, and to trademark the new logo which will be associated with my new company, and oversee all business associated with establishing said company.

In hereby authorizing Raymone K. Bain to perform the above said services, I appoint her as President/COO of said corporation. Ms. Bain shall use her best efforts in performing said services which are outlined as follows and all other business related to The Michael Jackson Company, and shall report directly to me with regards to any and all of my personal and professional business matters, which includes, but shall not be limited to:

**\*Accounting**
      a.) retaining auditors, including music auditors
      b.) retaining new accounting teams
**\*Legal Representation**
      a.) retaining representation regarding Sony music/catalog
      b.) retaining personal legal counsel
**\*Investors/Board of Directors for The Michael Jackson Company**
      a.) Schedule meeting w/ proposed Investors/Board of Directors between June 16th-June 30th, 2006
**\*Website**
      a.) authorization to create a website in the best interest of Mr. Jackson
**\*Appointment and supervision of staff for The Michael Jackson Company**
**\*Real property**
      a.) overseeing purchases and refinancing
**\*Business Opportunities:**
      a.) pursuing new business opportunities on behalf of Michael Jackson and the Michael Jackson Company. As compensation, Bain shall receive 10% Finder's fee of any Agreement(s) entered into by Michael Jackson, or the Michael Jackson Company, generated by, or due to the direct efforts of Bain and/or Bain's contracts.
**\*Term:**    Three (3) years.
**\*Jurisdiction:** Washington, D.C.

Page two

As President/COO of The Michael Jackson Company, this
appointment authorizes Ms. Bain to have full access to all
information regarding matters relating to Mr. Jackson and
MJJ Productions. Ms. Bain shall act as Mr. Jackson's advisor
and liaison to all accountants, attorneys, current and former
business managers, auditors, and other professionals who
are currently providing, or have provided advice and
services to Mr. Jackson in the past. Any decisions and
activities regarding MJJ Productions shall be reported to
Ms. Bain for direct approval by Mr. Jackson.

It is understood and agreed that Ms. Bain shall not sign any
documents on behalf of, or enter into any agreements
on behalf of Mr. Jackson, without his express written approval.


Michael Jackson


Raymone K. Bain


Witness:

6-1-06

# Exhibit B

*Davis, Bain and Associates, Inc.*
*4770 Dexter Street, N.W.*
*Washington, D.C. 20007*
*(202) 337-5595; Fax: (202) 337-6563*
*Email Address: RBain28460@aol.com*

May 30, 2006

I, Michael Jackson, do hereby appoint Raymone K. Bain as General Manager, overseeing my personal and business affairs, as directed by me. Within my organization, Ms. Bain shall have full access to information regarding matters relating to me and my companies. As a trusted advisor, Ms. Bain shall act as my liaison, and on my behalf, to all accountants, business managers, advisors, attorneys, current and former business managers, auditors, and other professionals, or individuals, who are currently providing, or have provided services to me, and my companies, in the past.

This authorization supercedes and cancels any and all other authorizations approved by me, which could be deemed a conflict of the responsibilities set forth in this Letter of Authorization.

_____
Michael Jackson

WITNESS: _____ 6.1.06

6-1-06

# Exhibit C

**Mr. MICHAEL JACKSON**
**d/b/a MIJAC MUSIC & MIRAN PUBLISHING CORP. (BMI)**
c/o Raymone K. Bain
Davis, Bain and Associates, Inc.
4770 Dexter Street, N.W.
Washington, DC 20007

Dated: As of June 1, 2006

Warner/Chappell Music, Inc.
10585 Santa Monica Boulevard
Los Angeles, CA 90025
Attn: Edward P. Pierson
Executive Vice President,
Legal & Business Affairs &
General Counsel

Reference is hereby made to the various agreements between you and me (the "Agreements"). This is to advise that I have appointed Raymone K. Bain, effective as of the date hereof, as my agent for purposes of approving those uses of compositions subject to such Agreements, which require my approval. For the avoidance of doubt, an approval from Ms. Bain shall be deemed to be an approval from me.

The foregoing authorization shall remain in full force and effect until modified or terminated in writing by me.

Thank you very much for your cooperation and attention to this matter.

Very truly yours,

MICHAEL JACKSON

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RAYMONE K. BAIN, *et al.*,

    Plaintiffs,

v.                               Civil Action No.: 09-00826(JR)

MICHAEL J. JACKSON, *et al.*,

    Defendants.

_____/

## AFFIDAVIT OF ELLEN MULCRONE SCHUETZNER

1. I, Ellen Mulcrone Schuetzner, am a forensic document examiner, and am board certified by the American Board of Forensic Document Examiners, Inc. My *curriculum vitae* is attached as Exhibit A to this affidavit.

2. I am over the age of 18, under no legal disability, and make this affidavit per my own personal knowledge.

3. Because of my education, training, knowledge, and experience, I possess knowledge of a specialized nature in the area of forensic document examination.

4. I have been qualified as an expert in state and federal courts of law on previous occasions in the field of forensic document examination.

5. I have reviewed the signature proffered as Michael J. Jackson's signature on the Payment and Release Agreement attached to Defendants' Motion to Dismiss in the above-captioned case. That document is also attached to my affidavit as Exhibit B.

6. I have also reviewed Michael J. Jackson signatures on the following documents:

    a. Copy of an authorization, dated 2/3/04

    b. Copy of a signature page bearing the fax date 2/24/04

    c. Copy of a letter dated 5/30/06

    d. Copy of an appointment letter, dated 5/30/06



e. Copy of an Agreement, dated 6/1/06

f. Copy of an Agreement, dated 6/1/06

g. Copy of a signature page of an Authorization, dated 6/1/06

h. Copies of two (2) Good Faith Estimates, each fax dated 6/12/06

i. Original signature page of a letter dated 7/5/06

j. Copy of a letter to Judge Castell, dated 7/17/06

k. Copies of three (3) signature pages, each dated 7/24/06

l. Copy of a signature page, dated 8/9/06

m. Copies of seven (7) letters , each dated 8/10/06

n. Copy of a cease and desist letter, dated 8/16/06

o. Copy of a Form 2848, dated 9/12/06

p. Copies of three (3) loan forms, each dated 9/15/06

q. Copy of a Power of Attorney-Special, dated 10/06

r. Copy of a declaration page, dated 01/07

s. Copies of seven (7) The Talon Group Addendum to HUD-1 Settlement Statement forms, Settlement date 06/07

t. Copy of a Borrower Signature Authorization, dated 6/4/07

u. Copy of a Borrowers' Certification and Authorization, dated 6/4/07

v. Copy of a Notice To The Home Loan Applicant Credit Score Information Disclosure, dated 6/4/07

w. Copy of a Disclosure Notices form, dated 6/4/07

x. Copy of an Equal Credit Opportunity Act form, dated 6/4/07

y. Copy of The Housing Financial Discrimination Act of 1977 Fair Lending Notice form, dated 6/4/07

z. Copy of a Preliminary Estimate, dated 6/13/07

aa. Copy of a Form W-9, dated 6/14/07

bb. Copy of an Acknowledgement, dated 6/14/07

cc. Copy of a Borrower Affidavit of Full Disclosure form, dated 6/14/07

dd. Copies of seven (7) Verification forms, each bearing fax date 6/15/07

ee. Copy of a Verification form, bearing fax dated 6/16/07

ff. Copy of an approval, dated 9/14/07

gg. Copy of an Acknowledgement and Agreement, dated 9/14/07

hh. Copy of a signature page, dated 10/07

ii. Copy of a signature page, fax date 10/3/07

jj. Copy of a signature page, dated 10/29/07

kk. Copy of a signature page of an Amendment, dated 10/29/07

ll. Copy of an Acknowledgement and Acceptance page, fax date 11/20/07

mm. Copy of a signature page, undated

nn. Original Agreement signature page, undated

oo. Copy of a signature page of an Agreement, undated

pp. Copy of an Affidavit In Support of Defendants' First Amended Original Answer, undated

qq. Copy of a Compliance Agreement, undated

These documents are attached as Exhibit C to my affidavit.

3

7.  Having reviewed these authentic signatures, and the proffered signature on the Payment and Release Agreement, I can say within a reasonable degree of scientific certainty that there are indications that the signature on the proffered Payment and Release Agreement may not have been prepared by the person who prepared the known Michael J. Jackson signatures.

8.  I have reached this conclusion because I have found differences between the questioned and known signatures in some of the handwriting habits, such as in the size of the top loop in the lower case "c" in "Michael, the retraced form of the overcurve in the "h", the angular movement on the right side of the ascender in the ending stroke of the "l", the height of the bottom of the ascender loop of the "J", the use of the looped "c" in Jackson, the form of the "k", possible pen lift or hesitation in the right side of the overcurve after the "k", possible pen lift in the connecting stroke to the overcurve before the ending stroke, design of the questioned signature, baseline habit, and the limitations in the examinations due to the quality of the reproduction of the questioned signature.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Ellen Mulrone Schuetzner

STATE OF ILLINOIS
COUNTY OF _____ Cook _____

Sworn to and subscribed before me this 4th day of January, 2010, by Ellen Mulrone Schuetzner, who is personally known to me or who produced Driver License as identification.

_____
Notary Public
My commission expires:  02/28/10

OFFICIAL SEAL
T BATOROWICZ
NOTARY PUBLIC   STATE OF ILLINOIS
MY COMMISSION EXPIRES FEBRUARY 28, 2010

4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Raymone K. Bain, *et al.*,          :
                                    :
          Plaintiffs,               :
                                    :
     v.                             :   Civil Action No. 09-0826 (JR)
                                    :
MICHAEL J. JACKSON, *et al.*,       :
                                    :
          Defendants.               :

### ORDER

For the reasons stated in the accompanying memorandum, defendants' motion to dismiss, which has been construed as a motion for summary judgment [#24] is **granted**.

It is **SO ORDERED**.

JAMES ROBERTSON
United States District Judge


EXHIBIT
8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Raymone K. Bain, *et al.*,          :
                                    :
          Plaintiffs,               :
                                    :
     v.                             :   Civil Action No. 09-0826 (JR)
                                    :
MICHAEL J. JACKSON, *et al.*,       :
                                    :
          Defendants.               :

## MEMORANDUM

Prior to Michael Jackson's death in June 2009, Raymone K. Bain brought this case against him and his production company, MJJ Productions, Inc., asserting claims for breach of contract, quantum meruit, and unjust enrichment. Bain became Jackson's publicist in December 2003, but the suit arises out of the expanded role Bain took in Jackson's affairs beginning in the middle of 2006. On May 30, 2006, Jackson signed a Personal Services Agreement ("PSA"), drafted by Bain, that entitled Bain to a ten percent finder's fee for any agreement Jackson entered that she or her associates generated. [#3-1]. Around this time, Jackson also hired Bain as his personal General Manager, [#3-2], and as his agent to review and approve music usage requests, [#3-3].

Bain alleges that she initiated negotiations for several projects on Jackson's behalf in early 2007, including: (1) a project with SONY Music to promote the 25th anniversary of Jackson's *Thriller* album release ("*Thriller* deal"); (2) Jackson's

participation at the 2008 Grammy Awards ceremony; (3) a project
with the Anschutz Entertainment Group, Inc. for development of
the Neverland Valley Ranch, recording and film projects, and live
performances at the O2 Arena in London ("AEG project"); and
(4) Jackson's refinancing of his loan against the SONY/ATV music
catalog ("SONY/ATV refinancing").[1]  Shortly after the
refinancing, but before the other projects were finalized,
Jackson abruptly cut ties with Bain, without paying the ten
percent finder's fee on any of Bain's projects.  Because Jackson
ultimately cemented the agreements and earned money on them in
2008, Bain believes she is now entitled to a ten percent finder's
fee for each deal pursuant to the PSA.  She seeks $44 million in
damages, plus attorney's fees and costs.  [#3]

On June 18, 2009, the Jackson parties moved to dismiss
Bain's claims, arguing that Bain's suit was barred by a release
she signed on December 27, 2007 that discharged the Jackson
parties from any future claims and payments.  [#24].  Jackson
died eight days later, on June 26, 2009.  I stayed further
proceedings pending the appointment of an executor for Jackson's
estate.  I also notified the parties that the motion to dismiss
would be treated as a motion for summary judgment and invited

---

[1]     Bain also attempts to take credit for another deal —
one involving use of Jackson's music in a Vitamin Water
advertisement aired during the Superbowl [#49] — but I have
denied her motion to amend her complaint.  [#50]

them to submit all additional material pertinent to the motion.
[#31].  I dissolved the stay on November 20, 2009.  The parties
then filed supplemental briefing and affidavit testimony
regarding the release and addressing Bain's new allegation that
the release was fraudulently obtained.  [#48, #54, #59, #60,
#61].

        The Jackson parties replied with their own new
(alternative) argument – that the binding arbitration clause in
the Release requires dismissal or a stay in this case.  Under New
York law, the contractual right to arbitrate may be waived, when
the requesting party "engaged in litigation to such an extent as
to manifest[] a preference clearly inconsistent with [its] later
claim that the parties were obligated to settle their differences
by arbitration and thereby elected to litigate rather than
arbitrate."  See, e.g., Les Constructions Beauce-Atlas, Inc. v
Tocci Bldg. Corp. of New York, Inc., 294 A.D.2d 409, 410 (N.Y.
App. Div. 2002) (internal quotations omitted).  To avoid waiver,
a party must raise its desire to arbitrate promptly and must
decline to avail itself of pre-trial discovery and other attempts
to litigate on the merits.  Id.

        The Jackson parties' first filing did not raise the
arbitration issue.  Rather, they elected to address the merits of
Bain's claim, and did not invoke their right to arbitration –
presumably realizing that the case would not be resolved quickly

- 3 -

on the merits - until filing a reply brief on the motion to
dismiss on July 10, 2009.  [#29, at 4-6].  I find that the
Jackson parties' initial filings invoked the judicial process to
such an extent that their right to arbitrate has been waived.

Therefore, I must determine whether the Release covers
the fees Bain now demands, and, if it does, whether the Jackson
parties had a duty to disclose the status of those deals at the
time Bain signed the release.[2]

The Release, which the parties agree is governed by New
York law, states that Jackson "shall render a payment made
payable to you in the amount of [$488,820.05] as full and final
satisfaction of any all [sic] monies, known or unknown, to be
owed to you by the Jackson Parties with respect to any and all
agreements whether verbal or written that you may have entered
into with the Jackson Parties from the beginning of time until
December 27, 2007."  [#27-2 at 20].

Bain argues that this language does not preclude her
from seeking a finder's fees pursuant to the PSA, because she
intended the Release to cover only specific, past-due cash
disbursements, loans, credit card bills, and consultant fees, in
the amount of $488,820.05.  As evidence of her intent, she cites

---

[2]     The "tender back doctrine" is not applicable here,
where Bain is indisputably entitled to the payment she retained,
and where that amount would be credited to the defendants if Bain
were to succeed in her claim. See Goldfarb v. Wright, 40 N.Y.S.2d
705, 707-709 (N.Y. App. Div. 1943).

her hand-written edits to the Release, itemizing the payments she intended to release, [#27-2 at 20], and she explains that Jackson's attorney, Frank Salzano, represented, in his 12/03/07 email, that the Release was necessary "to clean all past debts and liabilities of Mr. Jackson," [#60-2].

Under New York law, the rule is that "a valid release which is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced as a private agreement between the parties," even if one of the parties claims he intended a narrower release. See, e.g., Chaudhry v. Garvale, 262 A.D.2d 518, 519 (N.Y.A.D. 2 Dept, 1999). Because I find no ambiguity in the language of Bain's Release, I may apply it without considering Bain's testimony about her intent. Consolidated Edison, Inc. v. Northeast Utilities, 332 F.Supp.2d 639, 647 (S.D.N.Y. 2004). The Release unambiguously covers "all monies, known or unknown," owed under "any and all agreements whether written or verbal." (emphasis added)  That release language covers Bain's claims about the *Thriller* deal, the Grammy ceremony, the AEG project, and the SONY/ATV refinancing, no matter what stage they were in when the release was signed.

But Bain goes on to argue that, even if the Release does cover her claims, it is void because she was fraudulently

induced to sign it, or, alternatively, because she was mistaken as to is effect.

To establish fraud-in-the-inducement under New York law, Bain must prove that the Jackson parties (1) made a material representation or omission which was false and known to be false (2) for the purpose of inducing her to rely on it, and (3) that Bain reasonably relied upon it in entering the agreement (4) to her detriment. See, e.g., Lama Holding Co. v. Smith Barney, Inc., 88 N.Y.2d 413, 421 (N.Y. 1996). Where the claim is that the defendant fraudulently concealed a material fact to procure the agreement, the plaintiff must show that the defendant had a duty to disclose the concealed information. See, Sitar v. Sitar, 61 A.D.3d 739, 741 (N.Y. App. Div. 2009). Absent a fiduciary relationship between the parties, a duty to disclose arises only where one party possesses superior knowledge of essential facts that makes a transaction inherently unfair – if those facts are not disclosed, those facts are not readily available to the other party, and the first party knows that the second party is acting on the basis of mistaken knowledge. UniCredito Italiano SPA v. JPMorgan Chase Bank, 288 F.Supp.2d 485, 497 (S.D.N.Y. 2003).

Bain's own complaint demonstrates why the Jackson parties had no duty of disclosure. It paints a picture of Bain as a savvy business woman who founded her own public relations firm, has represented "many high profile public figures in the

sports, entertainment and political fields," was responsible for
essentially all of Jackson's affairs for a period of time,[3] and
in fact "spoke to [him] several times a day" during that time.
[#3 at ¶¶ 2,7-11, 18-41].  For the deals at issue here, Bain
alleges more than minor involvement; she claims that she played
an integral and substantial role in negotiating all of them.  Id.
Bain clearly knew that various deals were in the works - in fact,
she admits to initiating them and participating in on-going
discussions about them - and she does not explain why, given her
relationships with the parties involved, she could not readily
have discovered the status of the agreements before signing the
Release.  Thus, the Jackson parties had no duty to disclose the
status of the projects on which Bain bases her claims, nor, if
there were any omissions, was it reasonable for Bain to rely on

---

[3]     Bain appears to take credit for saving Jackson from
financial and legal ruin.  If her recitation of the services she
performed for Jackson is to be believed, she must have been more
knowledgeable about Jackson's business than he was.  She claims
that, among other things, she was responsible for hiring a
creative manager for Jackson (¶ 20); she hired a legal and
accounting team (¶ 21); she facilitated an audit of Jackson's
finances (¶ 22); she averted imminent foreclosures of his
properties (¶ 23); she arranged Jackson's day-to-day housing and
living requirements (¶ 24); she hired a new personnel company to
pay Jackson's employees (¶ 25); she approved music usage requests
that generated over ten million dollars in annual income for
Jackson (¶ 26); she supervised a team of accountants to address
complaints lodged with the California Department of Labor (¶ 27);
and she was responsible for paying Jackson's creditors and other
bills (¶ 28).

- 7 -

them.[4]  See Banque Franco-Hellenique de Commerce Intern. et
Maritime, S.A. v. Christophides, 106 F.3d 22, 27 (2d Cir. 1997)
(the defrauded person need not exercise due diligence, but
reliance is not justifiable where the defrauded party exercised
minimal diligence despite being "placed on guard or practically
faced with the facts").

      For the same reasons, Bain's argument that the Release
is voidable under the doctrine of mistake must be rejected.  It
is illogical to believe that the Jackson parties knew or should
have known that Bain was unaware of the deals - a showing that is
required to prove unilateral mistake.  See, e.g., Kraft Foods,
Inc. v. All These Brand Names, Inc., 213 F.Supp.2d 326, 330
(S.D.N.Y. 2002).

      Bain's equitable theories of recovery - quantum meruit
and unjust enrichment - also fail.  As to Jackson's estate, Bain
concedes that the PSA is a valid contract, which precludes relief
under those theories.  See, e.g., Bloomgarden v. Coyer, 479 F.2d
201, 210 (D.D.C. 1973).  As to MJJ Productions, Bain provides no
support for her contention that her efforts conferred a benefit
on MJJ Productions that it unjustly retained, nor does she
describe circumstances that would have reasonably notified MJJ

---

      [4]    Because I find the Jackson parties had no duty to
disclose the status of the deals, Bain's request, pursuant to
Rule 56(f), for discovery on this topic and other irrelevant
issues is denied.

Productions of her expectation that she would be paid.  In fact,
Bain provides virtually no explanation of what or who MJJ
Productions is; or how it is related to this suit; or whether she
even interacted with it during her negotiations.  Such a claim
without any support or reasonable likelihood of finding support
through discovery cannot withstand summary judgment.

      An appropriate order accompanies this memorandum.


                      JAMES ROBERTSON
                United States District Judge

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Raymone K. Bain, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civ. No. 09-CV-00826 (RCL) |
| Michael J. Jackson, et. al., | ) | |
| Defendants. | ) | |

## ORDER

Pending before the Court is Plaintiff's Motion to Enlarge Time to File Notice of Appeal with respect to the Court's Memorandum and Order Granting Summary Judgment of May 7, 2010 (the "Motion"). Upon careful consideration of the parties' motions and briefs, as well as the entire record of this case, the Motion is DENIED for the reasons stated herein.

### I

On May 7, 2010 Judge Robertson entered an order granting defendants' motion to dismiss the case with prejudice, which the Court had "construed as a motion for summary judgment." [Dkt. # 63] (the "Order"). Pursuant to Fed. R. App. P. 4(a)(1)(A) Plaintiff had 30 days from the entry of the Order to timely file a notice of appeal, but no such notice was filed. On July 6, 2010, pursuant to Fed. R. App. P. 4(a)(5) Plaintiff filed this Motion, requesting an additional 14 days following the grant of the Motion to file a notice of appeal.

1



EXHIBIT
9

## II

Fed. R. App. P. 4(a)(5)(A)(ii) allows the Court to extend Plaintiff's time to file a notice of appeal if she can show "excusable neglect or good cause."

> The excusable neglect standard applies in situations in which there is fault; in such situations, the need for an extension is usually occasioned by something within the control of the movant. The good cause standard applies in situations in which there is no fault -- excusable or otherwise. In such situations, the need for an extension is usually occasioned by something that is not within the control of the movant.

Fed. R. App. P. 4(a)(5)(A)(ii) advisory committee's notes to 2002 Amendments. Plaintiff argues that "excusable neglect or good cause" exists in this case because although she became aware of the Order on May 9, 2010 (two days after it was entered) her counsel at Gary, Williams, Finney, Lewis, Watson & Sperando, P.L. (the "Gary Firm") first specific communication to her regarding the Order came on July 1, 2010 when a member of the firm sent her a copy of the Order and informed her that the time to file an appeal had lapsed. [Pl. Mot. at 2-3]. Plaintiff further contends that one of her lawyers at the Gary Firm had "made repeated promises to plaintiff that he would file [a] Motion for Reconsideration of any adverse judgment in this case" [Pl. Mot. at 2] and that the Gary Firm never informed Plaintiff of her right to seek an extension of time to file a notice of appeal. *Id.* at 3. In sum, Plaintiff argues that the Gary Firm is at fault for neglecting to file the notice of appeal in a timely manner.

## III

The Court first considers whether "excusable neglect" exists in this case. The decision of whether neglect is "excusable" under Rule 4(a)(5) is "at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Pioneer Inv. Servs. Co. v.*

2

*Brunswick Assocs.*, 507 U.S. 380, 395 (1993).[1]  Such circumstances include (1) the danger of prejudice to the opposing party; (2) the length of delay and its potential impact on the proceedings; (3) the reason for the delay and whether the delay was within the reasonable control of the moving party; and (4) whether the late party acted in good faith.  *Id.*

"[T]he first two *Pioneer Investment Services* factors are of minimal relevance when applied to Rule 4(a)(5)(A)(ii) considering that a related motion can only be considered when it is brought within 30 days after the Rule 4(a)(1) filing deadline."  *Anyanwutaku v. Szego*, Civ. Action No. 99-3054 (CKK/JMF), 2006 U.S. Dist. LEXIS 42899, at *7 (D.D.C. June 12, 2006) (citing *Webster v. Pacesetter, Inc.*, 270 F. Supp. 2d 9, 14 (D.D.C. 2003)).  Thus, although the Court finds that the first two *Pioneer* factors do not weigh heavily against granting the Motion, their relevance is limited.

Regarding the fourth *Pioneer* factor, the Court finds that Plaintiff's actions regarding the notice of appeal are not necessarily contrary to good faith, as Defendants argue.  Defendants argue that Plaintiff's lack of good faith arises because Plaintiff had experienced difficulties getting the Gary Firm to file court papers in California and thus knew that her "counsel disregarded her instructions on other prior occasions."  Def. Mot. at 10.  Thus, "Ms. Bain was not justified in believing that her counsel would follow her direction to file an appeal."  *Id.*  The court does not believe, however, that the instance that Defendants cite means that Ms. Bain should not have been able to rely on her attorneys to fulfill subsequent customary responsibilities.  That a plaintiff has difficulties with his or her attorneys cannot mean that such

---

[1] Although *Pioneer* addressed the concept of "excusable neglect" in a bankruptcy law context circuit courts routinely apply its analysis to Fed. R. App. P. 4.  *See Webster v. Pacesetter, Inc.*, 270 F. Supp. 2d 9, 11 n.6 (D.D.C. 2003) (collecting cases).

plaintiff is thereafter barred from good-faith reliance upon counsel to perform subsequent customary duties. Thus, based on the record before it, the Court finds that the fourth *Pioneer* factor does not weigh substantially against the Motion insofar as Ms. Bain's actions are concerned.[2]

However, the Court finds the third *Pioneer* factor dispositive. Courts generally cite this factor as perhaps the most important factor in the excusable neglect analysis. *See Webster*, 270 F. Supp. 2d at 14. Plaintiff essentially argues that the Gary Firm's blatant neglect of its duties is the cause of the failure of Plaintiff to file a timely notice of appeal. This may be true, but in the Rule 4(a)(5) context parties should "be held accountable for the acts and omissions of their chosen counsel." *Pioneer*, 507 U.S. at 397 (explaining that the proper focus in this context is "whether the neglect of respondents *and their counsel* was excusable.") (emphasis in original); *see also Thomas v. United States*, No. 94-5340, 1996 U.S. App. LEXIS 3709, at *1 (D.C. Cir. 1996) (reversing district court's grant of extension of time under Rule 4(a)(5) because counsel's mistake in calculating the number of days in a month "cannot constitute excusable neglect") (internal quotation marks omitted); *Webster*, 270 F. Supp. 2d at 14 (finding no excusable neglect under Rule 4(a)(5)(A)(ii) where "counsel [was] clearly at fault for the delay."). Thus, even

---

[2] The Court notes that it has not received any explanation from the Gary Firm regarding the failure to file a notice of appeal in this case, and thus the Court will not assume that any failure of the Gary Firm to file the notice of appeal was consistent with good faith. Such information would be useful in clarifying the narrative associated with that failure. *See* note 3, *infra*.

assuming that the Gary Firm was at fault for not filing the notice of appeal out of pure neglect as the Plaintiff alleges,[3] the Court finds that such neglect is inexcusable under Rule 4.

The Court next considers whether there exists "good cause" that warrants granting the Motion. The Court sees nothing not within the control of the movant or her counsel that caused or contributed to the delay that warrants an extension of time. Thus, the Court finds that no "good cause" exists in this case.

## IV

For the reasons stated *supra*, the Court hereby ORDERS that the Motion is DENIED.

**SO ORDERED.**

October 15, 2010

> */s/ Thomas F. Hogan*
> Thomas F. Hogan
> United States District Judge
> Acting as Motions Judge

---

[3] The July 3, 2010 letter from Plaintiff to the Gary Firm that Plaintiff includes with the Motion sketches a somewhat ambiguous picture regarding this point. Plaintiff first suggests that the Gary Firm "purposely" did not file a notice of appeal [*Id.* at 1], and states that as late as May 10, 2010 had specifically promised her that the Gary Firm would appeal the Order. *Id.* at 4. However, the Letter also suggests that the Gary Firm had discussed the need of the Plaintiff to file the notice of appeal herself. *Id.* (explaining that on May 26, 2010 Mr. Gary told Plaintiff that he would send a "'Letter of Reconsideration' to Judge Robertson, which would *buy us time to obtain counsel for an appeal*" (emphasis added)); *Id* at 5 (asserting that in a July 1, 2010 email Mr. Linnes Finney of the Gary Firm told Plaintiff that he had "previously advised [Plaintiff] that [the Gary Firm would] not be filing an appeal and [Plaintiff would] have to retain counsel to do this."). In any case, the Court fails to extract from these exchanges any further reason to grant the Motion.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| RAYMONE K. BAIN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No. 09-826 (RCL) |
| | ) | |
| MICHAEL J. JACKSON, *et al.*, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

Before the Court is the plaintiffs' motion [71] for relief from judgment under Fed. R. Civ. P. 60(b)(2) and motion [78] for a hearing.  Upon consideration of the motions, the defendants' opposition [74], the applicable law, and the entire record herein, the Court will deny the motions.

## I.  BACKGROUND

An extensive description of the facts underlying this litigation appears in Judge James Robertson's memorandum opinion [62] accompanying his order [63] granting summary judgment for the defendants.  The plaintiffs filed suit against the defendants, Michael Jackson and his production company, MJJ Productions, Inc., on May 5, 2009.  The lead plaintiff, Raymone Bain, served as a publicist for Jackson starting in December 2003 and took on additional roles, including a position as general manager, in the spring of 2006.  Bain and Jackson signed a Personal Services Agreement ("PSA") on May 30, 2006 entitling Bain to a 10 percent finder's fee for projects generated by Bain or her associates.  Bain orchestrated a number of such projects for which she believes she is due $44 million, such as a release through SONY Music of a 25th Anniversary edition of Michael Jackson's album *Thriller.*

The defendants filed a motion [24] to dismiss on June 18, 2009, arguing primarily that

1

Bain signed a document on December 27, 2007 releasing them from liability under the PSA. Jackson died eight days later. Judge Robertson entered a stay, which he dissolved on November 2009. Judge Robertson treated the defendants' motion to dismiss as a motion for summary judgment and requested supplemental filings, after which he entered judgment for the defendants. The plaintiffs had argued that the parties only intended the release to apply to specific past-due debts, references to which Bain annotated into the typed contract, and not to finder's fees contemplated under the PSA. However, the release stated that Jackson "shall render a payment made payable to [Bain] in the amount of [$488,820.05] as full and final satisfaction of any all [*sic*] monies, known or unknown, to be owed to you by the Jackson Parties with respect to any and all agreements whether verbal or written that you may have entered into with the Jackson Parties from the beginning of time until December 27, 2007 (the 'Payment')." Judge Robertson held that this unambiguous language covered all agreements between the parties, including the PSA. The plaintiffs also argued that the defendants fraudulently failed to disclose the status of relevant deals at the time Bain signed the contract. Judge Robertson disagreed, finding that as a savvy businesswoman Bain could not have justifiably relied on any omissions the defendants made regarding the release. Judge Robertson found the plaintiffs' other arguments similarly unavailing and entered judgment for the defendants through an order issued May 7, 2010.

The plaintiffs filed a motion under Fed. R. Civ. P. 60(b)(2) for relief from judgment on October 4, 2010, arguing that newly discovered evidence established the invalidity of the 2007 release. They subsequently filed a motion for a hearing on May 29, 2012.

## II.   DISCUSSION

Federal Rule of Civil Procedure 60(b) provides six bases for a district court to relieve a

2

party from an otherwise final judgment. *Lepkowski v. Dep't of Treasury*, 804 F.2d 1310, 1311-12 & n.1 (D.C. Cir. 1986). As relevant here, Rule 60(b)(2) provides as grounds for relief "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." The plaintiffs argue that they have discovered such evidence in the form of a letter from Jackson to Bain dated April 24, 2008. The letter, included as an attachment to the plaintiffs' motion, states:

> I have never terminated your services nor did I null and void any of your Agreements. I know nothing about a release form. I neither authorized or [*sic*] signed the same.[1] Therefore, I am authorizing you to continue to communicate with Mr. Yakoob regarding the Sultan [of Brunei]'s property in Las Vegas, and to continue your role as my General Manager and President/COO of The Michael Jackson Company.

The letter refers to "the Sultan's property" because Jackson was looking to purchase a permanent residence at the time and was potentially interested in that property. Bain avers in an affidavit that she received this letter, and that it was filed among documents relevant to the Sultan's property. A consultant for the Michael Jackson Company, LLC took these files from Bain; the consultant returned the box during or before July 2010, after which point Bain found the 2008 letter. Bain states that she had searched for this letter among her files during the pendency of the litigation but was unable to find it. The plaintiffs argue that this newly discovered letter provides grounds for relief from the judgment for the defendants.

In order to obtain relief under Rule 60(b)(2), a party must show that "(1) the newly discovered evidence is of facts that existed at the time of trial or other dispositive proceeding, (2) the party seeking relief must have been justifiably ignorant of the evidence despite due diligence, (3) the evidence must be admissible and of such importance that it probably would have changed the outcome, and (4) the evidence must not be merely cumulative or impeaching." *Lightfoot v.*

---

[1] The 2007 release does appear to be signed by Jackson. The plaintiffs suggest that it was not, but Judge Robertson implicitly rejected this argument in determining that the release was valid. *See* Mem. Op. [62] at 5.

3

*District of Columbia*, 555 F. Supp. 2d 61, 68 (D.D.C. 2008) (internal modifications omitted). The 2008 letter fails to meet the first two requirements.

As to the first, Bain's knowledge of the letter during the time of trial defeats her claim for Rule 60(b)(2) relief. The first requirement limits the operation of the rule to evidence that is truly "new," and "evidence cannot be newly discovered if it was known to the party at the time of trial." *Id.* (quoting *Lans v. Gateway 2000, Inc.*, 110 F. Supp. 2d 1, 5 (D.D.C. 2000)). In *Lightfoot*, the plaintiff sought relief from a judgment denying his claims under the Family and Medical Leave Act, 29 U.S.C. § 2601, in part under Rule 60(b)(2); the plaintiff sought to introduce additional certificates of disability he had received from his physician. The Court denied the motion. The plaintiff had "knowledge or possession of these medical certificates prior to the judgment on the pleadings being entered," and he therefore could not claim that the certificates were "new" evidence. *Id.* at 68-69. Similarly, in *Lans v. Gateway 2000, Inc.*, the Court determined that because the plaintiff "knew of the [document]'s existence, he cannot now claim that it is newly discovered evidence." 110 F. Supp. 2d 1, 5 (D.D.C. 2000). The plaintiffs here argue that those two cases do not apply because they involved evidence that the movants had in their possession during the litigation, while Bain did not regain possession of the 2008 letter until after judgment. But possession is not dispositive; either knowledge *or* possession is sufficient to defeat a claim that evidence is new. *See Lightfoot*, 555 F. Supp. 2d at 68; *Lans*, 110 F. Supp. 2d at 5. Here, as in *Lightfoot* and *Lans*, the plaintiffs were fully aware of the evidence during the litigation, and that evidence cannot be considered "new."

The plaintiffs similarly failed to exercise due diligence in seeking out the 2008 letter. In *Lans*, the Court denied a Rule 60(b)(2) motion both because the evidence was not "new" and because Lans failed to exercise due diligence. There, the claim that Lans took adequate steps to

4

secure the documents at issue was undermined by his knowledge of the evidence, "regardless of whether he could actually get his hands on it." *Lans*, 110 F. Supp. 2d at 6. Even though Lans could not "remember where [a document] was, he should have notified the Court and the defendants as to its potential existence and requested time to locate it." Because the plaintiff did not do so, the Court determined he had failed to exercise due diligence. Similarly here, Bain knew of the 2008 letter's existence, and the plaintiffs failed to reference it in any of their filings with the Court. Bain states in her affidavit that the plaintiffs filed a supplemental response to the defendants' motion for summary judgment on March 8, 2010 that alluded to the issue of the 2007 release's invalidity. But this is true only to the extent that the plaintiffs' lawyer, Mark Miller, submitted an affidavit stating that if permitted by the Court the plaintiffs would engage in further discovery into, *inter alia*, "Mr. Jackson's intent as to the Release Agreement." Mark Miller Aff. [60-1] at 2 ¶ 2.d. The motion and related exhibits, like the other filings in this case prior to entrance of judgment for the defendants, do not mention the 2008 letter. When a party fails to make any mention on the record of a relevant document of which it has knowledge, the party cannot be said to have conducted due diligence in attempting to procure it.

## III.   CONCLUSION AND ORDER

The 2008 letter is neither newly discovered evidence, nor did the plaintiffs exercise due diligence in trying to obtain it. It is therefore hereby

**ORDERED** that the plaintiffs' Rule 60(b)(2) motion is **DENIED**; and it is further

**ORDERED** that the plaintiffs' motion for a hearing is **DENIED** as **MOOT**.

**SO ORDERED.**


Signed by Royce C. Lamberth, Chief Judge, on June 7, 2012.

5